In the United States District Court for the District of Columbia

Risenhoover

v.                                    Civil No. 22-cv-01177 (UNA)

Von Reitz, "Justice of Alaska", et al

## UNITED STATES DISTRICT COURT

### for the

City and County of Washington DC

| America ex rel Risenhoover | ) | |
| --- | --- | --- |
| *Plaintiff/Petitioner* | ) | |
| v. | ) | Civil Action No. |
| Reitz et al | ) | |
| *Defendant/Respondent* | ) | |

Supplement on Jurisdiction

Plaintiff notes that this Court in recent precedent has accorded a pro se private litigant the general right to command attention of this Court to pleadings liberally, such that an Amended Complaint would be a mere supplement to an Original. Viz:

*Because plaintiff is proceeding pro se, the Court not only treats her original and amended complaints together as the operative pleading, but also considers all of plaintiff's motions and additional filings as her opposition to Capital One's motions.*
https://ecf.dcd.uscourts.gov/cgi-bin/show_public_doc?2021cv2382-33

Because the matter appears now to be on initial review, Plaintiff is supplementing the authorities for precedents to show that when the Civil Rights Act, or anti-3K Act was passed, 42 U.S. Code § 1983 cognized acts "under color of"… "State" or "Territory" to include those acting under even a modicum of mere pretense. This language can be seen to arise from the 1790 Crimes Act ("*or any pretence of authority from any person, such offender shall, notwithstanding the pretence of any such authority*"), and Civil War precedents, such that when a pretender exercising pretense to a colorable authority, such as being an "Justice of Alaska", or organizing "Jural Assemblies" in opposition to the federal authority of the United

States (of America), and in open and notorious opposition to the State of Alaska (and all States of "_____"), then a common law torts of terroristic threats (to deport and extradite all bar members, and perhaps import unlawful and illegal violence to their persons, against the peace of the States, Palmyra Territory, territories and possessions, and all places under the control, or occupation, of the civil and military authorities, or subject to their jurisdiction, capturing 22 CFR 51.1, 22 CFR 120.13, 22 USC 211, 212, 22 USC 611(m), 22 USC 619, 19 USC 3185, Neely v Henkel, Lin v US, Tseng v Trump, Risenhoover v Washington County (22 CFR 51.1 before 2007)). The Jural Assemblies, apparently are "persons" as are their Recording Secretaries, officially, ex officio, or in propria persona. And while Guam is an unincorporated little lower-case "t" territory, Alaska apparently was incorporated, yet the Courts have not considered the actual status of the civil government of the United States established in the island of Guam: *"In this case we must decide whether a Territory or an officer of the Territory acting in his or her official capacity is a "person" within the meaning of 42 U. S. C. § 1983 (1982 ed.)." Ngiraingas v. Sanchez, 495 U.S. 182, 109 L. Ed. 2d 163, 110 S. Ct. 1737 (1990).*

It is certainly not clear that the Jural Assemblies, or Justice of Alaska Ms. Van Reitz, will assert they are a State, for purposes of Eleventh Article of Amendment delegated immunity from the sovereign peoples of those States. When the Constitution was being debated, the admission of new States was a reference to secessionary rebellion against the authority of the Sovereign King in British north America, or the Canadas (infra). Thus, the proper reach of a 42 U.S. Code § 1983 claim extends to foreign territory, such as the Jural Assemblies appear to be organizing in Australia, Canada and elsewhere.

Ngiraingas (a Palauan) did not reach the question of whether a sub-sovereign, such as the island of Guam, even with an Organic Act (or enabling legislation such as the Taiwan Enabling Act, 22 USC 3301 et seq, as titled in the Statutes at Large, govinfo.gov). Moreover, the piratical and terroristic threats of the Jural Assemblies Handbook, their websites, mails, emails, and over the wires (internet), portending to deport, extradite, and extrajudicially punish and assault and batter any member of a BAR, and presumably any civil servant or officer, any notary public, etc., evokes their similarity indeed to "an unorganized body of men, who are thieves, robbers and pirates simply, with no pretense of authority from an organized government, does not relieve the insurer from liability under the clauses in question" Swinnerton v. Columbian Insurance Co.

This is not to concede that they lack any colorable pretense to authority or have "no

pretense of authority from an organized government". They have all the public indicia of constituting a self-organized, notorious legislatures and governments: "when a portion of the citizens of a civil government have rebelled, established another government,".

"*Whereas large numbers of lawless and evil-disposed persons, especially in the States lately in rebellion, having conspired together and bound themselves to each other by unlawful oaths, have formed secret organizations, some of which are commonly known as the Ku-**Klux Klan**, having for their main object to defeat certain classes of citizens of the United States in the liberty, rights, and equal protection of the laws guaranteed by the Constitution.*"

https://memory.loc.gov/cgi-bin/ampage?collId=llhb&fileName=041/llhb041.db&recNum=10923

The Jural Assemblies, although legislatures, claiming to be legislatures of states, such as an Jural Assembly of Alaska, even if not legally redundant to a State of Alaska, or a STATE OF ALASKA, do not enjoy Speech and Debate Clause Immunity from the Constitution of the united States of north America, whose authority they do not recognize, and from whom they cannot claim special solicitude, but for as wards of the nation, and then only as petitioners for redress from the entities properly entitled to Speech and Debate Clause Immunity, or protection under the first Articles of Amendment. And even if the said Jural Assemblies are merely putative States, there does not appear to be any immunity attached to them if purely foreign, even under the doctrines of foreign state immunity or the Foreign Sovereign Immunities Act, nor that the Eleventh Article of Amendment intended to immunize future States, especially when they were not properly Territories. (see Magoon on Civil Government, Senator Pettigrew on American Empire, and Senator Perry Belmont and his public record, and Loring on Reconstruction, all at Hathitrust).

Abjuring any allegiance to the national, federal Constitution of the general

Government, it is odd to see how the Defendants can assert that either the Alaskan Constitution, or ours, somehow extends to their Jural Assemblies, immunity for terroristic speech and imminent, visceral threats. Unless the Court concede to them war powers, the Jural Assemblies surely have no unfettered common, private, or general right to accuse Notaries Public and civil servants under bonds, of treason to the United states of north America, nor to threaten all members of the BAR (even if this Court reasonably threatens some members through referral for discipline, or as the Central District of California recently did in injunctive proceedings, to deem the immediately prior President to be in unlawful cahoots with Professor John Eastman, former Law Clerk to The Honorable, Clarence Thomas, Associate Justice of the Supreme Court of the United States (of America).

It is now pretty well known that notorious persons even proceeded from Alaska, to this District, and entered the Congress irregularly, to command attention of the Electoral College, and in doing so, apparently obtained the notebook computer of the Speaker of the House and returned with it to Alaska. So that the Jural Assemblies might act on the call to action espoused by Justice of Alaska Anna von Reitz, is not completely a hypothetical.

It is said that before Palau became a full sovereign, she was subject to both the Trusteeship Agreement's government under the United States, and to her own nascent constitutional administration, pending final disposition of the trusteeship with the Principal Victor over Japan who formerly administered the mandate for the islands. So it is possible for sovereign to be, in formation, or subject to another sovereign, as a Freely Associated State (Estadio Asociado Libre) such as Palau to the US, or perhaps, Puerto Rico.

See:  **Morgan Guaranty Trust Co. v. Republic of Palau, 639 F. Supp. 706 (1986)**
*With the adoption of its Constitution and Compact, Palau has reactivated a sovereignty which had been dormant.*

The concept of a dormant sovereignty was expressed by the Legal Adviser to the War Department on the status of Cuba under United States Military Government:
*The sovereignty of Spain has been withdrawn from Cuba, but the sovereignty of the United States has not attached thereto, and the sovereignty, declared by Congress to be possessed by the people of the island, remains* dormant*. Under these conditions the military government of Cuba continues to be a substitute for sovereignty, as though*

*the question of sovereignty were still pending the outcome of a war.  https://babel.hathitrust.org/cgi/pt?id=hvd.32044049328065&view=1up&seq=39&skin=2021&q1=dormant*

*That is to say, title does not, like Mahomet's coffin, hang in mid-air. It is apparent that the title to public property in Cuba has not passed to the sovereignty inherent to the people of Cuba, for that sovereignty is dormant; and incapable of acquiring title. It would seem to follow that the correct theory is that the fee title to the public property in Cuba passed to the United States, burdened with a trust in favor of the future permanent government of Cuba.  https://babel.hathitrust.org/cgi/pt?id=hvd.32044049328065&view=1up&seq=362&skin=2021&q1=dormant*

*The terroristic threats by Reitz are not protected putative legislative speech:*

*"...as a general rule, so long as the Virgin Islands legislators are engaged in the sphere of legitimate legislative activity, they are absolutely immune from suit, including actions seeking damages, as well as those seeking only declaratory or injunctive relief."*

*II. Immunity of Virgin Islands Legislators from Suit pursuant to 42 U.S.C. §1983*

*One of the questions this case presents is, notwithstanding the absolute immunity from suit that Virgin Islands legislators enjoy as a general rule, whether the Senators of the 25th Legislature are immune from suit brought pursuant to 42 U.S.C. § 1983. "Whether legislators are absolutely immune from suit for violating a federal statute is a question of statutory construction." Latino Political Action Committee, Inc. v. City of Boston, 581 F. Supp. 478, 483 (D. Mass. 1984).*

*The objective of statutory construction is to ascertain Congress' intent. Ross v. Hotel Employees and Restaurant Employees Intern. Union, 266 F.3d 236, 245 (3d Cir. 2001). Congress does not legislate in a vacuum, but against a*

backdrop that includes the decisional law of the Supreme Court. See Sea-Land Service, Inc. v. United States, 874 F.2d 169, 173 (3d Cir. 1989).

Title 42 U.S.C. § 1983 originated as section 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, as a means of enforcing the provisions of the Fourteenth Amendment. Monroe v. Pape, 365 U. S. 167, 171 *623(1961). In 1951, the Supreme Court held that state legislators could claim legislative immunity if they were sued for violation of section 1 of the 1871 statute — then codified as 8 U.S.C. § 43. Tenney v. Brandhove, 341 U.S. 367, 376 (1951). The Supreme Court determined that Congress,, with the general language of the 1871 statute, did not intend to covertly overturn the tradition of legislative freedom. Id.

Just three years later, Congress passed the Revised Organic Act of 1954. The Court assumes that when Congress enacted the Speech or Debate Clause of the Revised Organic Act, it was. aware that the Supreme Court had recently determined that state legislators were legislatively immune from suit for violation of section 1 of Act of 1871. If Congress was concerned with legislators being afforded such immunity, it could have omitted the Speech or Debate Clause from the Revised Organic Act, specifically provided that Virgin Islands' legislators could be held to answer in civil rights cases, or subjected Virgin Islands' senators to suit particularly in actions for violation of 8 U.S.C. § 43 — now 42 U.S.C. § 1983. The Court interprets Congress' passage of the Speech or Debate Clause of the Revised Organic Act without qualification as a manifestation of its intention to guarantee that Virgin Islands' Senators could claim absolute legislative immunity from suit, including from suits brought pursuant to section 1 of the Ku Klux Klan Act of 1871.

In addition, under a basic rule of statutory construction, absent contraiy legislative intent, a specific enactment controls over a general statute, whether the specific act pre-

*or post-dates the general statute…See Creque v. Luis, 803 F.2d 92, 94 (3d Cir. 1986). Section 1983 is a broad, general statute. Preiser v. Rodriguez, 411 U.S. 475, 489 (1973) (holding that despite literal applicability of terms of section 1983, specific federal habeas corpus statute governed). The Speech or Debate Clause, of the Revised Organic Act applies specifically to Virgin Islands legislators. Thus, the Speech or Debate Clause of the Revised Organic Act trumps section 1983.*

*IV. Conclusion*

*Virgin Islands legislators, under the Speech or Debate Clause of the Revised Organic Act of 1954, as a general riile, are absolutely immune from suit, so long as they are engaged in the sphere of legitimate legislative activity. Neither 42 U.S.C. § 1983 nor section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), abrogate this legislative immunity. Because Plaintiffs have not stated a claim for which relief may be granted against the Senators of the 25th Legislature, the Court grants the Senators' motion to dismiss.*

**Hispanos Unidos v. Government of the United States Virgin Islands, 45 V.I. 619 (2004)**

**Mauran v. Insurance Co., 73 U.S. 1, 6 Wall. 1, 18 L. Ed. 836 (1867)**

*The Crimes Act of 1790[1] makes the taking of a vessel of the United States by rebels an act of piracy. It says:*

*"If any citizen shall commit any piracy or robbery aforesaid, or any act of hostility against the United States, or any citizen thereof, upon the high seas under color o/any commission from any foreign prince or state, or any pretence of authority from any person, such offender shall, notwithstanding the pretence of any such authority, be deemed, adjudged,*

and taken to be a pirate, felon, and robber; and on being thereof convicted, shall suffer death."

In United States v. Wiltberger, [§] the court, obiter, says that the sole object of this statute was to reach a citizen of the United States who deprecates on commerce of the United States undercolor of a foreign commission. The word "foreign" here includes, of course, any government other than the United States, and especially a pretended government; and most especially a pretended government in rebellion against our own.

The definition of piracy by the law of nations is this:

"Depredating on the seas, without being authorized by any [*4]sovereign state, or with commissions from different sovereigns at war with each other."[*]

Of course, looking to all the conditions of the rebellion, cruising by rebels who are as yet unacknowledged by anybody, even as a de facto government, would be cruising without being authorized by any sovereign, and so would be piracy by the law of nations.[†]

The proclamation of the.President of the United States ot April 19, 1861,[‡] is explicit, as follows:

" And I hereby proclaim and declare, that if any person, under the pretended authority of said (Confederate) States, or under any other pretence, shall molest a vessel of tbe United States, or the persons or cargo on board of her, such person will be amenable to the laws of the United States for the prevention and punishment of piracy."

This proclamation is fully justified by the section of the Crimes Act heretofore cited. It was in force at the time of the taking of the ship Marshall. Its applicability is recognized by successive acts of Congress,[§] and it was obligatory on every citizen of the United States; construing every contract made within the United States between citizens of the same.

How then can this court, a depository of the judicial power of the United States, recognize as a government of any kind, a confederation whose representatives the political department proclaims to be pirates, and who, as in the case of Smith, tried before Grier, J.,[||] have been tried and convicted as such.

In whatever light-they may be to be looked on by the courts of foreign powers, certainly all cruisers, under the flag of whatever combination of persons, are, in all courts of the United States, to be regarded as pirates by the law of nations, *5unless such persons have been recognized by the Executive as lawful belligerents, and so a de facto government. That this is a true principle of law, this court decided on all the questions arising out of the Spanish-Ameriean Revolution, holding that if the captors represented a de facto authority recognized by the Executive of the United States, they were not pirates by the law of nations,* but that if not so recognized by the Executive, they were.* Indeed, on these public questions, courts must respect the acts of their own governments, whether herein those acts be reasonable or unreasonable, or even right or wrong. They caunot stultify their own countries.

So also is the law of Great Britain. In a debate on a matter quite kindred to this one, Lord Chelmsford said:*

"If the Southern Confederacy had not been recognized by us as a belligerent power, he agreed with his noble and learned friend (Lord Brougham), that any Englishman aiding them by fitting out a privateer against the Federal government would be guilty of piracy."

The Lord Chancellor (Campbell) impliedly admitted this, in saying that an Englishman entering the Confederate service could not be deemed a pirate after the publishing of the Queen's proclamation recognizing the Southern States as " entitled to the exercise of belligerent rights and carrying on what might be called a justum. bellum."

In accordance with these views is the case of Swinerton v. Columbian Insurance Company, in the Superior Court of New York City. There a policy of insurance was made on a schooner against the usual perils, including "pirates, rovers, thieves," but " warranted free from loss or expense arising from capture, seizure, or detention, or the consequences of *6any attempt thereat." The vessel was lying at Norfolk, for repair, on the 21st of April, 1861, four days after the passage, by the State of Virginia, of her " secession ordinance," when a band of men came alongside of her with ..a steamboat, and professing to act by authority of the State of Virginia, without riot or tumult, towed her out into the channel, and there sunk her. The Superior Court, at first at nisi prius, and then in banc, held that the secession

*ordinance could not be admitted in evidence for the defence ; and that the loss did not come within the exception, but was a loss by pirates, rovers, and thieves. So also in point is the case, before the Commercial Court, or Handelsgericht, of Bremen,[*] of the Harvest, captured by the Shenandoah, a rebel cruiser; where a similar decision was made, and supported by a learned opinion. It will be strange if foreign courts pay a respect to what is done by the political department of our government which the courts of our own country do not.*

*Messrs. B. R. Curtis and Siorrow, contra:*

*The policy uses the word "pirates " in that simple and ordinary sense, in which it now is, and immemorially has been, known to the general commercial law of the civilized world; and not to describe offenders against some municipal criminal law, of some particular country. The interpretation and effect of policies belong to a system of law, existing before the statute of 1790, or any of President Lincoln's proclamations were made, and was not intended to be affected by them. This system of law is not merely a branch, or division of municipal law, but belongs to, and is part of, the common law of nations which defines piracy.[†]*

*Such instruments have no reference to the legality of-governments: they refer always to die facto authority of kings, princes, and people; and an interpretation which [*z]should make a risk depend ou the legality of an actual government, under whose authority the property had been captured, seized, or detained, would be unprecedented and dangerous.[*] Lemonuier[†] cites a decision of the Tribunal of Commerce, of Marseilles, that the revolted Colombians, having attacked only Spaniards, and not all nations like pirates, were to be considered a government.*

*No authority can be produced to show that a capture under a commission issued by a regularly organized defacto government, engaged in open and actual war, to cruise against its enemy, and against its enemy only, is piracy under the laws of nations.*

*The authorities are the other way.[‡]*

*The Executive government of the United States has, by public proclamations and messages to Congress, and in other appropriate public documents, recognized and affirmed a condition of open and public war, existing*

*between the United States and & de facto government of the so-called " Confederate States."[§] And the United States cannot at the same time insist that they have the belligerent rights which by the law of nations belong to a sovereign waging public war, and yet assert that there is no such public war as is known to the law of nations. That it is a civil war, does not change the rule of the law of nations respecting those who carry it on.[||]*

*Any capture or seizure, whether rightful or wrongful, and [\*8]whether made under a commission from a de jure, or de facto government, or made by mere pirates, is equally within the warranty in this case. Such is the interpretation of the words " capture, seizure, and detention," by writers of authority on Insurance,[\*] and by courts also. The English cases of Powell v. Hyde, [†]and of Kleinworth v. Shephard, [‡]are in point. In the former case it was held by Lord Campbell, Coleridge and Wightman, JJ., that the loss of a British vessel in the Danube by being fired upon by the Russians (then at war with Turkey, but not with England), was within the exception of " warrant free from capture and seizure," and in the second the terms were extended to a mutiny of Coolie passengers.[§]*

*And the words capture and seizure are so often used by correct writers and judges, and in legislation, to describe the acts of pirates and of persons acting under de facto governments, as to manifest a jus et norma loquendi.*

*Finally. The very question now raised has beeu fully argued and directly adjudicated in the Supreme Courts of Pennsylvania, Massachusetts, and Maine.[||]*

*We may concede that the United States have never admitted the so-called "Confederate States" to be a government. And this is a matter most proper to be asserted by the United States in its dealings with both its own citizens and foreigners. It may well treat every citizen of the United States who aided in the rebellion as committing treason or piracy; and regard transfers of property, &e., made in virtue of the Confederate laws, and against those of the [\*9]United States, as void. So in dealing with foreign powers it may properly assert that these did a wrong to us in recognizing the Confederacy as a belligerent power. But this case raises no such question as any of these. The fact remains that here was a great power capable of levying war against us, which did so levy and wage war, and which made a capture. Much of the*

*disquisition by opposing counsel is therefore from, the purpose. It has no practical application.*

*Reply: The case of Powell v. Hyde, the first of the two English cases, relied on by the other side, was that of a "capture" or "seizure," in the usual sense of the words, made by a power authorized to wage war, and then actually waging war.*

*Kleinworth v. Shephard, the other English case — the only case in which "seizure" has been said to include acts of individuals not acting under the authority of a recognized government, and in which it was extended by the Court of Queen's Bench to the mutiny by Coolie passengers — was argued before Lord Campbell, Wightman, Crompton, and Hill, JJ., but four of the fifteen English common law judges, none of which four had any peculiar experience or authority in commercial law, and the weight of whose opinion must therefore depend upon the soundness of the reasons assigned for it. The case, before it is finally disposed of, may be taken to the Court of Exchequer Chamber, if not to the House of Lords, and their decision overruled. It is hardly in any respect such a decision as should induce this court to go against the recent express decision, in Swinerton v. Columbian Insurance Co., of the Superior Court of the City of New York, a tribunal which has long held the position of a very high authority on questions of maritime law ; or against the able decision in the Commercial Court of Bremen, a tribunal in which public law in reference to this class of cases is of necessity very familiar to the court.*

\*

*3 Commentaries, 302, note d, 6th ed.*

\*

*Nesbitt v. Lushington, 4 Term, 783; 2 Arnould on Insurance, §§ 303, 305, 306; 1 Phillips on Insurance, §§ 1106-1108; 2 Parsons Maritime Law, 236, 246.*

†

*7 Abridgment, 92; and see 639 et seq.*

‡

*§ 9, 1 Stat. at Large, 114.*

§

*5 Wheaton, 76.*

\*

*Lawrence's Wheaton's Int. Law, 246, ed. 1863.*

†

*United States v. Klintock, 5 Wheaton, 144.*

‡

*12 Stat. at Large, 12, 58.*

§

*Act of 24 July, 1861, Id. 273; Act of 6 Aug., 1862, Id. 314.*

‖

*3 Wallace, Jr., MS.*

\*

*United States v. Palmer, 3 Wheaton, 610, 634; The Divina Pastora, 4 Id. 52; Nuestra Senora de le Caridad, Id. 497; The Josefa Segunda, 5 Id. 338; Nueva Ana, 6 Id. 193; Santissima Trinidad, 7 Id. 337.*

†

*United States v. Klintock, 5 Wheaton, 144; United States v. Smith, Id. 153.*

‡

*Hansard, vol. 162, p. 2082.*

\*

*Weser Weekly Zeitung, of January 12, 1867. A printed translation was furnished by Mr. Cushing to the court.*

†

*Warren v. The Man. Ins. Co., 13 Pickering, 518 ; Deshon v. The Mer. Ins. Co., 11 Metcalf, 199 ; The Malek Adhel, 2 Howard, 232; The Antelope 10 Wheaton, 122.*

\*

*Nesbitt v. Lushington, 4 Term, 783.*

†

*On Insurance, vol. 1, 251.*

‡

*The Savannah, Warburton's Report, 365-374; United States v. Smith, 5 Wheaton, 153, and note; Same v. Pirates, Id. 196 ; The Malek Adhel, 2 Howard, 211; The Sealskins, 2 Paine, 333; United States v. Hanway, 2 Wallace, Jr., 202; and see Mr. Burke's letter to Sheriffs of Bristol, vol. 2, p. 90, Little & Brown's edition of Burke's Works; Mr. Webster's Letter to Mr. Fox, 6 Webster's Works, 256, 257.*

§

*The President's Proclamation of April 19, 1861; his Reply to the Virginia Commissioners (Moore's Rebellion Record, vol. i, p. 61); his Proclamation of*

*April 27, 1861; his Message to Congress, July 4, 1861; his Proclamations of August 12, 1861, and of August 16, 1861.*

‖

*Vattel (Chitty's ed.), 424; Lawrence's Wheaton, 516, 622; Halleck's International Law, 233, 343; Santissima Trinidad, 7 Wheaton, 283; United States v. Palmer, 3 Id. 610; Neustra Senora, 4 Id. 497.*

*

*Marshall, pt. i, ch. xii, § 3 ; 1 Phillips, § 1110; 2 Arnould, \*808, \*811; Benecke, p. 348 (p. 230 of English ed.); Emerigon (by Meredith), 353 ; 3 Kent's Commentaries, \*304; Pothier, Insurance, No. 54; Valin's Commentary, Art. 26, 46; 2 Boulay Paty Commercial Law, § 16, p. 102 (Brussels, 1838.)*

†

*5 Ellis & Blackburne, 607.*

‡

*1 Ellis & Ellis, 447.*

§

*And see Goss v. Withers, 2 Burrow, 694; McCar v. New Orleans Insurance Co., 10 Robinson's Louisiana, 202, 334, 339; Tirrell v. Gage, 4 Allen, 245.*

‖

*Fifield v. Insurance Co., 47 Pennsylvania State, 166; Dole v. Same, 6 Allen, 373; Dole v. Same, 51 Maine, 464.*

*Mr. Justice NELSON*

delivered the opinion of the court.

The question in the case is, whether this taking of the *10 vessel by the naval forces of the so-called Confederate States was a capture within the warranty of the assured in the margin of the policy ? If it was, then the loss is not one of the perils insured against, as the assured, in express terms, had assumed it upon himself.

A capture, as defined by some of the most eminent writers on insurance within the policy, is a taking by the enemy of vessel or cargo as prize, in time of open war, or, by way of reprisal, with intent to deprive the owner of it. This was probably the primary or original idea attached .to the term in these instruments. Losses of ships and cargo engaged in commerce by the public enemy were the most to be apprehended and provided against. But usage, and the course of decisions by the courts, have very much widened this

*meaning, and it now may embrace the taking of a neutral ship and cargo by a belligerent jure belli; also, the taking forcibly by a friendly power, in time of peace, and even by the government itself to which the assured belongs.[1]*

*Capture is deemed lawful when made by a declared enemy, lawfully commissioned, and according to the laws of war, and uulawful wheu made otherwise; but, whether lawful or unlawful, the underwriter is liable;, the words of the policy being broad enough, and intended to be broad enough, to include every species, of capture to which ships or cargo, at sea, may be exposed. Any other rule would furnish but a very imperfect indemnity to the assured if we regard either the character of these seizures and the irregularities attending them, or the trouble, expense, and delay consequent up>on the duty or burden of proving in a court of justice the unlawfulness of the act. It is never, therefore, a question, between the insurer and the insured whether the capture be lawful or not. The recent case of Powell v. Hyde[1] is very decisive on this point. In that case a British ship passing [*11]down the Danube was fired upon from a Russian fort and sunk. A war existed between Russia and Turkey, but none betweeu the former and Great Britain. The policy of insurance in that ease contained the warranty of the assured " free from capture, seizure," &c., upon which the underwriters relied, as here, for a defence. In answer to this it was urged for the assured that these words in the warranty related to a lawful capture or seizure, by a party having authority to make it, and that, inasmuch as the capture was in open violation of law and wholly illegal, it was not within the warranty, and the underwriters were, therefore, liable. But the court held otherwise, and determined that this term in the warranty was not confined to lawful capture, but included any capture, in consequence of which the ship was lost to the insured. This same principle was again deliberately asserted by the court in Kleinworth v. Shepherd.[1] The same question had been decided many years before by Lord Mansfield in Berens v. Rucker,[1] in which he held the insurer liable in case of an illegal capture of a neutral vessel by an English privateer. Chancellor Kent states the rule as follows: "Every species of capture, whether lawful or unlawful, and whether by friends or enemies, is also a loss within the policy."[2] As kindred to this rule is another, that the insurer is liable for a loss by capture, whether the property in the thing insured be changed by the capture or not. In every case of an illegal capture the property is not changed, yet as between, the insurer and the insured, the effect is the same as in case of a capture by an enemy in open war.*

*In the case of a capture under a commission from au organized government, against an enemy, jure belli, to bring the capture within the policy, it is not necessary that the commission should issue from a perfectly lawful govei'uruent any more than that the capture itself should be lawful. The principle is the same. An illustration will be found in the \*₁₂war between Spain and her revolted colonies in South America, which continued for many years. Our government was the first to recognize their independence, "which was in 1822; but even down till this event, from the time the revolt had reached the dimensions of a civil war, the government had recognized the war, and conceded equal belligerent fights to the respective parties; and the capture of the vessels of Spain by a commander under a commission by one of the colonies in the exercise of this right, was recognized as legal as if it had occurred in open public war, and, as- a matter of course, would have been within the marginal warranty clause of the insured in a policy of insurance. Indeed it has been so held. It will be observed that at this time these colonies, had not achieved their independence; they were yet in the heat of the conflict; nor had they been recognized by any of the established governments on either continent as belonging to the family of nations. In this connection it will not be inappropriate to refer to the case of United States v. Palmer, \*which was an indictment against the defendant for piracy in the capture of a Spanish vessel under a commission from one of these colonies, and which he set up as a defence. One of the questions certified from the circuit was, whether the seal annexed to the commission purporting to be a public seal used by persons exercising the powers of government in a foreign colony, which had revolted from its allegiance and declared itself independent, but had never been acknowledged as such by the United States, was admissible in a court of the United States as proof of its legal existence with or without proof of its genuineness. The court held that the seal of such unacknowledged government could not be permitted to prove itself, but that it might be proved by such testimony as the nature of the case would admit. The defendant was permitted, also, to prove that he was employed in the service of the colony at the time of making the capture, and which, it was agreed, would constitute a defence to the in\*₁₃dictment for piracy. The proof became necessary on account of the obscurity and unknown condition of this incipient state.*

*Another illustration will be found in a capture by a cle facto government, which government is defined to be one in possession of the supreme or sovereign power, but without right — a government by usurpation, founded*

*perhaps in crime, and in the violation of every principle of international or municipal law, and of right and justice; yet, while it is thus organized, and in the exercise and control of the sovereign authority, there can be no question between the insurer and the insured as to the lawfulness of the government under whose commission the capture has been made. If any presumption could properly be indulged as to the perils against which the insured would most desire to protect himself, it might well be captures by these violent and irregularly constructed nationalities. The court in the case of Nesbitt v. Lushington,* fitly described the character of the government contemplated in the clause respecting the restraints, &c., of kings, princes, or people, namely : " the ruling power of the country," " the supreme power," " the power of the country, whatever it might be," — not necessarily a lawful power or government, or one that had been adopted into the family of nations.*

*Now, applying these principles to the case before us, it will be seen that the question is not w'hether this so-called Confederate government, under whose authority the capture was made, was a lawful government, but whether or not it was a government in fact, that is, one in the possession of the supreme power of the district of country over -which its jurisdiction extended? We agree that all the'proceedings of these eleven states, either severally or in conjunction, by means of which the existing governments were overthrown, and new governments erected in their stead, were wholly illegal and void, and that they remained after the attempted separation and change of government, in judgment of law, *14as completely under all their constitutional obligations as before.*

*The Constitution of the United States, which is the fundamental law of each and all of them, not only afforded no countenance or authority for these proceedings, but they were, in every part of them, in express disregard and violation of it. Still, it cannot be denied but that by the use of these unlawful and unconstitutional means, a government, in fact, was erected greater in territory than many of'the old governments in Europe, complete in the organization of all its parts, containing within its limits more than eleven millions of people, and of sufficient resources, in men and money, to carry on a civil war of unexampled dimensions; and during all which time the exercise of many belligerent rights were either conceded to it, or were acquiesced in by the supreme government, such as the treatment of captives, both on land and sea, as prisoners of war; the exchange of prisoners; their*

*vessels captured recognized as prizes of war, and dealt with accordingly; their property seized on land referred to the judicial tribunals for adjudication; their ports blockaded, and the blockade maintained by a suitable force, and duly notified to neutral powers the same as in open and public war.*

*We do not inquire-whether these were rights conceded to the enemy by the laws of war among civilized nations, or were dictated by humanity to mitigate the vindictive passions growing out of a civil conflict. We refer to the conduct of the war as a matter of fact for the purpose of showing that the so-called Confederate States were in the possession of many of the highest attributes of government, sufficiently so to be regarded as the ruling or supreme power of the country, and hence captures under its commission were among those excepted out of the policy by the warranty of the insured.*

*We could greatly extend the opinion upon this branch of the case by considerations in support of the above view, but the question has undergone very learned and able examinations in several of the State courts, deservedly ot the highest \*15eminence, and which have arrived at the same conclusion, and to which we refer as rendering further examination unnecessary.\**

*Judgment affirmed.*

*Dissenting, the CHIEF JUSTICE and Mr. Justice SWAYNE.*

*Note. At the same time with the preceding were argued and adjudged four other eases by the same plaintiff against other insurance companies, all four being adjudged in the same way as the one above reported. In two of them the policies and warranty were in the same language as in that case. In two others there was a difference in the marginal warranty of the insured in this, that while he warranted free from loss or expense by capture, &c., "ordinary piracy" was excepted, so that if the loss was on account of a capture or seizure by pirates, the insured would have been entitled to recover. But Nelson, J., giving the judgment of the court, observed that as the court had arrived at the conclusion that the capture of the vessel was under the authority of a quasi government, or government in fact (the ruling power of the country at that time], it was to be held to be within the warranty or exception in the marginal clause. Dissenting, the Chief Justice and Swayne, J.*

\*

*Phillips on Insurance, §§ 1108-1109; Arnould on Same, 808, 814; 2 Marshall on Same, 495, 496, 507; Powell v. Hyde, 5 Ellis & Blackburne, 607.*

†

*Already referred to; 5 Ellis & Blackburne, 607.*

\*

*1 Ellis & Ellis, 447.*

†

*1 Blackstone, 313.*

‡

*3 Commentaries, 304-5.*

\*

*3 Wheaton, 610.*

\*

*4 Term, 763.*

\*

*Dole v. New England Mutual Ins. Co., 6 Allen, 373 ; Fifield v. Ins. Co., 47 Pennsylvania State, 166; Dole v. Merchants' Marine Ins. Co., 51 Maine, 464*

The Florida Constitution, Article I, Section 21, provides: "[t]he courts shall be open to every person for redress of *any* injury, and justice shall be administered without sale, denial or delay."

## Lloyd v. Page, 474 So. 2d 865 (1985)

Aug. 14, 1985 · Florida District Court of Appeal · No. BD-246

474 So. 2d 865

### Winston LLOYD, Appellant,*v.*James PAGE, Appellee

District Court of Appeal of Florida, First District.

Rehearing Denied Sept. 19, 1985.

Winston Lloyd, pro se, for appellant.

Granville C. Burgess of Burgess, Wood & Poole, P.A., Fernandina Beach, for appel-lee.

SHIVERS, Judge.

Winston Lloyd appeals the trial court's dismissal of his complaint with prejudice for lack of jurisdiction. We reverse.

Appellant Lloyd, pro se, brought a 42 USC § 1983 civil rights action against ap-pellee Page, the Nassau County Property Appraiser. Lloyd alleged that Page, acting maliciously and in bad faith, under color of State law, acted to deprive Lloyd of his homestead exemption rights, in violation of rights guaranteed him under the Fourteenth Amendment of the United States Constitution.

Appellee Page moved to dismiss for lack of jurisdiction and, assuming jurisdiction, on other grounds. We will address the stated ground for dismissal, lack of jurisdiction.

Appellee argues in his brief that jurisdiction is not properly vested in state courts. The pertinent federal statute, 42 U.S.C. section 1983, states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person *866 within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The federal law gives the federal courts original jurisdiction. In 28 U.S.C. § 1343:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

We need to determine whether state courts also have jurisdiction over section 1983 cases. Most judicial decisions which have concluded that state courts can entertain section 1983 actions, have relied on the general principle of concurrent jurisdiction.

In *New Times, Inc. v. Arizona Board of Regents,* 20 Ariz.App. 422, 513 P.2d 960 (1973), *vacated on other grounds,* 110 Ariz. 367, 519 P.2d 169 (1974), that court stated:

28 U.S.C.A. § 1343, the jurisdictional grant keyed to section 1983, contains no language granting exclusive jurisdiction to federal courts. The statute merely confers "original jurisdiction" upon the district courts. The phrase "original jurisdiction" has uniformly been defined as the power to entertain cases in the first instance as distinguished from appellate jurisdiction and does not mean exclusive jurisdiction. See Bors v. Preston, 111 U.S. 252, 4 S.Ct. 407, 409, 28 L.Ed. 419 (1884); People of the Territory of Guam v. Rosario, 296 F.Supp. 140 (D.C.Guam 1969), and Petros v. Bosen, 185 Okl. 351, 91 P.2d 735, 736 (1939).

The State of Tennessee chose a minority view — that it would be illogical to require state courts to entertain section 1983 actions. In *Chamberlain v. Brown,* 223 Tenn. 25, 442 S.W.2d 248 (1969) that court wrote:

It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

The Tennessee *Chamberlain* position was specifically rejected in *New Times* and in the Illinois case of *Alberty v. Daniel,* 25 Ill.App.3d 291, 323 N.E.2d 110 (1974).

*Holt v. City of Troy,* 78 Misc.2d 9, 355 N.Y.S.2d 94 (1974), *Young v. Board of Education of Freemont City School District, RE-3,* 416 F.Supp. 1139 (D.C.Colo.1976), *Brown v. Pitchess,* 13 Cal.3rd 518, 119 Cal.Rptr. 204, 531 P.2d 772 (1975), and *Williams v. Greene,* 36 N.C.App. 80, 243 S.E.2d 156 (1978), all generally follow the rule espoused in *New Times, Inc. v. Arizona,* i.e., that the federal courts have not preempted this cause of action.

The Ohio case of *Jackson v. Kurtz,* 65 Ohio App.2d 152, 416 N.E.2d 1064 (1979), and the Utah case of *Kish v. Wright,* 562 P.2d 625 (Utah 1977) both approve the concurrent jurisdiction construction.

*Terry v. Kolski,* 78 Wis.2d 475, 254 N.W.2d 704 (1977) discusses the rationale permitting the states to exercise concurrent jurisdiction. The Wisconsin Supreme Court concludes that the language of section 1343 grants only original jurisdiction and does not vest exclusive jurisdiction. It does so after a review of the legislative history of section 1983.

In footnote 7 of Mr. Justice Stevens' opinion for the Court in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), note is made that there is no reason absent the contrary intent of Congress, for the states not to exercise jurisdiction, citing *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).

*\*867*The Alabama Supreme Court in *Terrell v. The City of Bessemer,* 406 So.2d 337 (Ala.1981), citing *Martinez v. California,* stated that, in an effort to avoid confusion over forum selection, Alabama must accept jurisdiction over section 1983 claims.

In *Ricard v. The State of Louisiana,* 390 So.2d 882 (La.1980), the Louisiana Supreme Court held that Louisiana had concurrent jurisdiction over 1983 claims. The State of Mississippi in *State Tax Commission v. Fondren,* 387 So.2d 712 (Miss.1980), held that although they agreed that state courts have jurisdiction over section 1983 actions, the exhaustion of state remedies is applicable in actions brought under section 1983 to enjoin, suspend, or restrain the assessment, levy, or collection of taxes because of 28 USC § 1341. Mississippi held that section 1341 is an explicit congressional limitation on the jurisdiction of the federal courts in cases which would enjoin, suspend, or restrain state tax levy, assessment, or collection.

The Supreme Court of Georgia, in *City of Cave Spring v. Mason,* 252 Ga. 3, 310 S.E.2d 892 (1984), held that the cause of action created by section 1983 is cognizable in Georgia, but the case is intertwined with the question of sovereign immunity.

Mr. Justice Stewart, writing for the United States Supreme Court in *Dowd Box Co. v. Courtney,* 368 U.S. 502, 508, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962),

observed that exclusive federal jurisdiction over cases arising under federal law has been the exception rather than the rule:

We start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule. This Court's approach to the question of whether Congress has ousted state courts of jurisdiction was enunciated by Mr. Justice Bradley in Claflin v. Houseman, 93 US 130, 23 L ed 833, and has remained unmodified through the years. "The general question, whether State courts can exercise concurrent jurisdiction with the Federal courts in cases arising under the Constitution, laws, and treaties of the United States, has been elaborately discussed, both on the bench and in published treatises ... [and] the result of these discussions has, in our judgment, been ... to affirm the jurisdiction, where it is not excluded by express provision, or by incompatibility in its exercise arising from the nature of the particular case." 93 US, at 136.

The issue of whether Florida will exercise concurrent jurisdiction of § 1983 actions has not been directly faced. *Metropolitan Dade County v. Wolf,* 274 So.2d 584 (Fla. 3d DCA), *cert. den.,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973), held that a' personnel weight restriction was not discriminatory, without discussing the jurisdictional question. *Zorick v. Tynes,* 372 So.2d 133 (Fla. 1st DCA 1979), made reference to jurisdiction over § 1983 actions but concluded that even if Florida could exercise jurisdiction, under the facts of the case, the petitioner's denial of employment was due to a job related requirement rather than the petitioner's physical disability.

*Penthouse, Inc. v. Saba,* 399 So.2d 456 (Fla. 2d DCA 1981) restated the question raised by *Martinez,* but does not specifically meet the issue. In *Arney v. State, Dept. of Natural Resources,* 448 So.2d 1041 (Fla. 1st DCA 1983), jurisdiction was not specifically addressed, but as in *Wolf* and *Penthouse,* jurisdiction oyer § 1983 actions was impliedly recognized.

The Florida Constitution, Article I, Section 21, provides: "[t]he courts shall be open to every person for redress of *any* injury, and justice shall be administered without sale, denial or delay."

We conclude that the majority and better view is that state courts have jurisdiction concurrent with federal courts to enforce federal cases arising under federal *868*law unless Congress has specifically provided to the contrary. *Dowd, supra.*

We reverse the trial court's dismissal of this cause for lack of jurisdiction.

In remanding, we note that appellant maintains he was denied homestead exemption because of appellee property appraiser's wrongful assertion appellant's house burned in 1983. Appellant claims he was so notified in April 1984, and that the property adjustment board met on May 15, 1984. The record shows appellant filed suit on June 26, 1984. The foregoing would indicate we are concerned with the appellant's 1984 homestead exemption. The property appraiser, in his brief, claims that appellant's action is untimely because he did not file his suit for over a year after the deadline expired. (Section 196.151, Florida Statutes, requires the homestead exemption applicant to file his suit within 15 days from the property adjustment board's refusal of the homestead exemption application.) It would appear that if appellant was "over a year late," we are considering the 1983 exemption and appellant would be entitled to the 1983 exemption if he were so entitled on January 1, 1983 (even if his house burned later in 1983). See Volume II, Section 4.02(6), *Florida State and Local Taxes,* Tax Section of the Florida Bar. If we are concerned with the 1984 homestead exemption, <mark>appellant would clearly be only a few days, if any, late, in filing his suit.</mark> <mark>All of this can, of course, be included</mark> in the matters addressed by the trial court.

REVERSED and REMANDED.

ERVIN and JONAOS, JJ., concur.

*In this case we must decide whether a Territory or an officer of the Territory acting in his or her official capacity is a "person" within the meaning of* [42 U. S. C. § 1983](#) *(1982 ed.).*

**Ngiraingas v. Sanchez, 495 U.S. 182, 109 L. Ed. 2d 163, 110 S. Ct. 1737 (1990)**

*The complaint, as finally amended, alleged that petitioners were taken to police headquarters in Agana where officers*

*assaulted them and forced them to write and sign statements confessing narcotics crimes.*

*Analogizing the government to an admininstrative agency, the court ruled that Guam is "no more than" a federal instrumentality, and thus is not a person within the meaning of § 1983. 858 F. 2d, at 1371-1372. "For the same reasons," the police department, also, is not a person under § 1983. Id., at 1372. Finally, the Court of Appeals ruled that Guam officials may not be sued in their official capacities under § 1983, because a judgment against those defendants in their official capacities would affect the public treasury and the suit essentially would be one against the government itself. Ibid. [2] Accordingly, the court affirmed the District Court's dismissal of the claims against the Government of Guam, the Guam Police Department, and the individual defendants in their official capacities.[3]*

*[\*186]Because of the importance of the question, and because at least one other Court of Appeals has advanced a different view as to whether a Territory is subject to liability under § 1983,[4] we granted certiorari, 493 U. S. 807 (1989).*

*Guam, an island of a little more than 200 square miles located in the west central Pacific, became a United States possession at the conclusion of the Spanish-American War by the Treaty of Paris, Art. II, 30 Stat. 1755. Except for the period from December 1941 to July 1944, when Japan invaded and occupied the island, the United States Navy administered Guam's affairs from 1898 to 1950, when the Organic Act was passed.[5] Among other things, the Act provided for an elected governor and established Guam as an unincorporated Territory. 48 U. S. C. §§ 1421a and 1422 (1982 ed.). It was said at the time that this unincorporated status did not promise eventual statehood. See H. R. Rep. No. 1365, App. No. 3, 81st Cong., 1st Sess., 9 (1949). The United States continues to this day to have a military presence in Guam, with an Air Force base, a Navy*

*communications base, air and weather stations, and a large complex that serves the Seventh Fleet.[6]*

*To determine whether Guam constitutes a "person" within the meaning of § 1983, we examine the statute's language and purpose. The current version relates to "[e]very person who [acts] under color of any statute … of any State or Terri\*187tory." The statute itself obviously affords no clue as to whether its word "person" includes a Territory. We seek, therefore, indicia of congressional intent at the time the statute was enacted. See District of Columbia v. Carter, [409 U. S. 418](), 425 (1973) (analysis of purposes and scope of § 1983 must "take cognizance of the events and passions of the time at which it was enacted"). See also United States v. Price, [383 U. S. 787](), 803 (1966).*

*B*

*Our review of § 1983's history uncovers no sign that Congress was thinking of Territories when it enacted the statute over a century ago in 1871. The historical background shows with stark clarity that Congress was concerned only with events "stateside." "Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment." Quern v. Jordan, [440 U. S. 332](), 354 (1979) (Brennan, J., concurring in judgment); see also Carter, [409 U. S., at 423]() ("[Section] 1983 has its roots in § 1 of the Ku Klux Klan Act of 1871, Act of Apr. 20, 1871"). After the War Between the States, race relations in the Southern States were troubled. The Ku Klux Klan, organized by southern whites, commenced "a wave of murders and assaults . . . against both blacks and Union sympathizers." [Id., at 425](). Congress was worried "about the insecurity of life and property in the South," and designed § 1 of the Act "primarily in response to the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." [Id., at 425-426]() (emphasis added).[7] "The debates are replete with*

*references to the \*188lawless conditions existing in the South in 1871. There was available to the Congress during these debates a report, nearly 600 pages in length, dealing with the activities of the Klan and the inability of the state governments to cope with it. This report was drawn on by many of the speakers" (footnote omitted). Monroe v. Pape, 365 U. S. 167, 174 (1961) (overruled in certain other respects by Monell v. New York City Dept. of Social Services, 436 U. S. 658 (1978)).*

*Because Congress was directly concerned with this unrest in the Southern States, it specifically focused on States in the legislation aimed at solving the problem. "As initially enacted, § 1 of the 1871 Act applied only to action under color of the law of any 'State.' 17 Stat. 13."[8] Carter, 409 U. S., at 424, n. 11. Persons acting under color of law of any Territory were not included. Viewed against "the events and passions of the time," id., at 425, it is evident that Congress was not concerned with Territories when it enacted the Civil Rights Act of 1871, but was concerned, instead, with the "hundreds of outrages committed . . . through the agency of this Ku Klux organization [that had not been] punished" in the Southern States. Cong. Globe, 42d Cong., 1st Sess., 505 (1871) (remarks of Sen. Pratt). As to Congress' failure to include persons acting under color of law of any Territory, \*189"[w]e can only conclude that this silence on the matter is itself a significant indication of the legislative intent of §1." Quern, 440 U. S., at 343. The omission demonstrates that Congress did not mean to subject. Territories, to liability under this statute.*

*Further, the remedy provided by § 1983 was designed to combat the perceived evil. "Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials." Carter, 409 U. S., at 428. "'The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges*

*can; their sympathies are not so nearly identified with those of the vicinage ....'" Ibid, (quoting Cong. Globe, 42d Cong., 1st Sess., 460 (1871) (remarks of Rep. Coburn)). Because the organization of the judicial system of a Territory was unlike those of the States, it would not have engendered such immediate concern. "Under the organic acts, each territory had three justices appointed by the president for four-year terms. Sitting together, they constituted a supreme court; sitting separately, they acted as district judges. In both capacities they had jurisdiction over cases arising under United States or territorial law." E. Pomeroy, The Territories and the United States 1861-1890, Studies in Colonial Administration 51 (1947). Thus, unlike the state courts, over which the Federal Government had no control, the territorial courts were created by Acts of Congress, with judges appointed by the President, and were under the general control of the Federal Government.*

*C*

*Finally, the successive enactments of the statute, in context, further reveal the lack of any intent on the part of Congress to include Territories as persons. In 1871, the Act exposed to liability "any person [acting] under color of any law ... of any State." Act of Apr. 20, 1871, § 1, 17 Stat. 13. \*190Such persons in the 1871 Act could not possibly have included a Territory because "Territories are not 'States' within the meaning of the Fourteenth Amendment," and a Territory could not have been a "person [acting] under color of" any state law. Carter, 409 U. S., at 424, n. 11. Any attempt to interpret "person" as including a "Territory" would be too strained a reading of the statute and would lead to a far more "awkward" interpretation than what a majority of the Court found significant in Will v. Michigan Dept. of State Police, 491 U. S. 58, 64 (1989) (to read § 1983 as saying that " 'every person including a State, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects . . .'"*

would be "a decidedly awkward way of expressing an intent to subject the States to liability").

This reading of the original statute is supported by its next enactment. In 1874, the phrase "or Territory" was added to § 1, without explanation, in the 1874 codification and revision of the United States Statutes at Large. Rev. Stat. § 1979. See Carter, *409 U. S., at 424, n. 11*. But while the 1874 amendment exposed to liability "[e]very person [acting] under color of any [law]... of any . . . Territory," it did not expose a Territory itself to liability. In the same revision that added "Territory" to § 1, Congress amended § 2 of the Act of Feb. 25, 1871, *16 Stat. 431* (the "Dictionary Act"), "which supplied rules of construction for all legislation." Monell v. New York City Dept. of Social Services, *436 U. S., at 719* (Rehnquist, J., dissenting); see also Will, *491 U. S., at 78* (Brennan, J., dissenting). In 1871, §2 of the Dictionary Act defined "person" as including "bodies politic and corporate."*9* The 1874 recodification omitted those three words and substituted "partnerships and corpora*191*tions."*10* It is significant that at the time Congress added "Territory" to § 1983, so that a person acting under color of territorial law could be liable under the statute, Congress clarified the definition of those whose actions could give rise to § 1983 liability. Most significant is the asserted reason for doing so:

"The reasons for the latter change [substituting 'partnerships and corporations' for 'bodies politic and corporate'] are that partnerships ought to be included; and that if the phrase 'bodies politic' is precisely equivalent to 'corporations,' it is redundant; but if, on the contrary, 'body politic' is somewhat broader, and should be understood to include a government, such as a State, while 'corporation' should be confined to an association of natural persons on whom government has conferred continuous succession, then the provision goes further than is convenient. It requires the draughtsman, in the majority of cases of employing the word 'person,' to take care that States, Territories, foreign governments, &c., appear to be excluded." 1 Revision of the United States Statutes as Drafted 19 (1872).

*As these comments make clear, at the time Congress first made it possible for a person acting under color of territorial law to be held liable, the very same Congress pointedly redefined the word "person" to make it clear that a Territory would not be included.[11] It is evident that Congress did not \*192 intend to encompass a Territory among those "persons" who could be exposed to § 1983 liability. "Just as '[w]e are not at liberty to seek ingenious analytical instruments' to avoid giving a congressional enactment the broad scope its language and origins may require, United States v. Price, 383 U. S., at 801, so too are we not at liberty to recast this statute to expand its application beyond the limited reach Congress gave it." Carter, 409 U. S., at 432.*

*In conclusion, when we examine the confluence of § 1983's language, its purpose, and its successive enactments, together with the fact that Congress has defined "person" to exclude Territories, it becomes clear that Congress did not intend to include Territories as persons who would be liable under § 1983.*

*Petitioners concede, Brief for Petitioners 4, 50, and we agree, that if Guam is not a person, neither are its officers acting in their official capacity.*

*We hold that neither the Territory of Guam nor its officers acting in their official capacities are "persons" under § 1983.[12]*

*Inasmuch as the Court of Appeals held that Guam is not a person for purposes of § 1983, it did not decide whether Guam enjoyed sovereign immunity under the Eleventh Amendment. 858 F. 2d, at 1372, n. 2.*

*See Frett v. Government of Virgin Islands, 839 F. 2d 968 (CA3 1988) (Government of Virgin Islands is subject to same liability under § 1983 as any other governmental entity). See also Fleming v. Department of Public Safety, Commonwealth of Northern Mariana Islands, 837 F. 2d 401 (CA9), cert. denied, 488 U. S. 889 (1988), discussed by the Ninth Circuit in the instant case, 858 F. 2d, at 1371, n. 1.*

*A. Leibowitz, Defining Status: A Comprehensive Analysis of United States Territorial Relations 313, 323 (1989).*

*7*

*The Ku Klux Act grew out of a message sent to Congress by President Grant on March 23, 1871. It said:*

*"A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these \*188evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear." See Cong. Globe, 42d Cong., 1st Sess., 244. See also Monroe v. Pape, 365 U. S. 167, 172-173 (1961).*

*8*

*The Act of Apr. 20, 1871, § 1, 17 Stat. 13, read:*

*"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States . . . ."*

*9*

*"That in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . ." 16 Stat. 431.*

*10*

*"In determining the meaning of the revised statutes, or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one, . . . the word 'person' may extend and be applied to partnerships and corporations . . . ." Rev. Stat. § 1. Because the words "or Territory" were added in the very "revised statutes" to which the language in the Dictionary Act refers, we conclude that the amended definition of*

"person" is the definition to which we look in determining whether a Territory is included in that definition.

[11]

This reasoning is fully consistent with the Court's decision in Monell v. New York City Dept. of Social Services, 436 U. S. 658 (1978). There the Court held that a municipality could be a "person [acting] under color of any law ... of any State," Act of Apr. 20, 1871, § 1, 17 Stat. 13, and thus *192was exposed to liability under the 1871 statute. In concluding that the 1871 Congress specifically intended to subject municipalities to § 1983 liability, we relied, among other things, on indications in the legislative history that municipal liability was contemplated, on the general treatment of corporations (including municipal corporations) as "persons," and on the 1871 version of the Dictionary Act. 436 U. S., at 686-689. As has been explained, the 1871 Congress had no similar intent with respect to Territories, and when it did address Territories in 1874, Congress intended not to subject them to liability. The 1874 revisions of the Dictionary Act, however, must be considered in light of the previously and more specifically expressed intent to subject municipalities to liability.

More recently, there have been at least two attempts in Congress to amend § 1983 to include States and Territories within the meaning of persons. The bills did not leave Committee. See Sagafi-Nejad, Proposed Amendments to Section 1983 Introduced in the Senate, 27 St. Louis U. L. J. 373, 374, 376, n. 21 (1983).

[12]

This conclusion makes it unnecessary to consider Guam's claim of immunity under the Eleventh Amendment.


Magoon on Law in military government:
It is an unbending rule of law, that the exer- cise of military power where the rights of the citizens are concerned shall never be pushed beyond what the exigency requires.

No one ever claimed that the government created by this legislation was that provided for by the Constitution of the United States for the States of the Union. It found its legal justifica- tion in being an exercise of the inherent right of national *sovereignty*; to adequately deal with a

*national emergency. The situation then existing is thus described by Birkhimer: But it was also true that the civil governments in the late insurrectionary States were inimical to the Union; that society there was in a dangerously disordered con- dition; that deep-seated enmity was at this period entertained by the leading people toward important principles of governmental policy which those who had saved the Union had resolved should be incorporated into the Constitution. The United States is in undisputed possession of the island, and therefore the military government of Porto Rico has ceased to occupy the place of the suspended or expelled sovereignty; of Spain and has become an instrument of the new sovereignty;. It has become the representative of sovereignty; instead of a substitute. Since hos- tilities have ceased in Porto Rico, it follows that the military gov- ernment is not authorized to adopt measures seeking to promote the success of military operations nor to justify its action on that ground.*

*The supremacy of military authority over the civil authority in the administration of the affairs of government is repugnant to the prin- ciples upon which stands the Government of the United States, and the theories of government cherished by the people of this nation and the race to which we belong. From the struggle which forced Magna Charta from an unwilling sovereign to that which compelled the Crown of Spain to relinquish sovereignty; in Cuba, the Anglo-Saxon race has never varied from its adhesion to the principle that the military was the subjected, and not the dominant, branch of government, save only amid the clash of arms or on other occasions when the government is called upon to exercise the right of self-defense conferred by the law of self-preservation. - It would seem, therefore, that the paramount purpose of a military government, after the war ceased, should be to create conditions which would enable the civil branch to assume the ascendency in the affairs of civil government, in kind if not in degree, with the paramount pur- pose during the war of promoting the success of its sovereign's mili- tary operations.*

*It, however, is well settled by the Supreme Court, that, as constitutional commander in chief, he is authorized to form a civil or military government for the conquered territory during the war; and that when such territory is ceded to the United States, as a conquest, the existing govern- ment so established does not cease as a matter of course or as a consequence of the restoration of peace; that, on the contrary, such*

*government is rightfully continued after the peace and until Congress legislates otherwise. \* \* \* So long as that government continues \* \* \* it represents the sovereignty; of the United States, and has the legal authority to enforce and execute the laws which extend over such territory. Congress may at any time put an end to this government of the conquered territory, and organize a new one. \* \* \* The power of Congress over such territory is clearly exclusive and universal.*
*The conditions existing in Cuba differ materially from those pre- vailing in Porto Rico, as do also the powers of the military government. The sovereignty; of Spain has been withdrawn from Cuba, but the sovereignty; of the United States has not attached thereto, and the sov- ereignty, declared by Congress to be possessed by the people of the island, remains dormant. Under these conditions the military govern- ment of Cuba continues to be a substitute for sovereignty;, as though the question of sovereignty; were still pending the outcome of a war. It appears to the writer that under this condition the military govern- ment of Cuba may exercise such powers of sovereignty; as are necessary for the successful conduct of the internal affairs of government, sub- ject to the restraints imposed by the ideas and theories of government prevailing under the sovereignty; by which it was created and the orders of the superior officials and authorities of the sovereignty; by which said military government is sustained.*
*The conditions existing in Cuba differ materially from those pre- vailing in Porto Rico, as do also the powers of the military government. The sovereignty; of Spain has been withdrawn from Cuba, but the sovereignty; of the United States has not attached thereto, and the sov- ereignty, declared by Congress to be possessed by the people of the island, remains dormant. Under these conditions the military govern- ment of Cuba continues to be a substitute for sovereignty;, as though the question of sovereignty; were still pending the outcome of a war. It appears to the writer that under this condition the military govern- ment of Cuba may exercise such powers of sovereignty; as are necessary for the successful conduct of the internal affairs of government, sub- ject to the restraints imposed by the ideas and theories of government prevailing under the sovereignty; by which it was created and the orders of the superior officials and authorities of the sovereignty; by which said military government is sustained.*
*This results from the fact that the only powers of the United States*

which anyone is authorized to exercise in the island of Cuba are the war powers of this nation; and the only instrument or agency of the United States authorized by Congress or by our theory of government to exercise said war powers in Cuba is the military arm or branch of the Government of the United States. As a general proposition, it is true that wherever the *sovereignty;* of the United States attaches the Congress may prescribe the ways and means, the manner, and methods by which such *sovereignty;* is to be asserted. - This presents the inquiry: Has the *sovereignty;* of the United States attached to Cuba? Did not the resolution of Congress passed April 20, 1898, recognize and declare that the *sovereignty;* of the island was in the people of Cuba and further that the United States disclaimed the right or intention of securing, assuming, or exercising *sovereignty;* in Cuba?

Theoretically Spain retained the right of *sovereignty;,* but the United States was in possession and exercising actual *sovereignty;.* The rights of the United States were those of a belligerent and arose from possession and were dependent upon the ability to maintain that possession. Under the doctrine of postliminy the *sovereignty;* and rights of Spain would become superior to those of the United States, if by any means Spain again came into possession of one or all of said islands.
*(see: To be sure, upon regaining possession, she would have been in of her old title, and not by a new one, but she would, by conquest, have regained*

*her old title. https://cite.case.law/supp-tex/25/465/* **State v. White &**

**Chiles, 25 Supp. Tex. 465, 25 Tex. Supp. 465 (1868)**, Dec.

*1868 · Supreme Court of Texas)*

*Although the city of New Orleans was conquered and taken possession of in a civil war waged on the part of the United States to put down an insurrection and restore the supremacy of the National Government in the Confederate States, that Government; had the same power and rights in territory held by conquest as if the territory had belonged to a foreign country and had been subjugated in a foreign war.*
*https://babel.hathitrust.org/cgi/pt?id=hvd.32044049328065&view=1up&seq=233&skin=2021&q1=%22that%20government%22*

*The prisoner challenged the jurisdic- tion of the civil court and assailed the indictment on the ground that he was not a citizen of the United*

*States, nor bound to yield allegiance to* that Government;. *Strong pressure was brought to bear in his behalf, and the district attorney, Mr. Blair, referred the matter to Washington for instruction.*
*https://babel.hathitrust.org/cgi/pt?id=hvd.32044049328065&view=1up&seq=279&skin=2021&q1=%22that%20government%22*

*In nearly all the cases tried the counsel for the defense have ent*

*ered pleas to the jurisdiction of the court, which the court overru*

*led, and in the case of Trujillo, who was convicted, the defense p*

*lead the jurisdiction of the court before the jury, declar ing it to*

*be unconstitutional to try any native inhabitant of New Mexico f*

*or the crime of treason against the Government of the United St*

*ates until by actual treaty with Mexico he became a citizen. The*

*court ruled out any consideration of this point by the jury, leavin*

*g it only the evidence and the facts upon which to make its verd*

*ict. Considering that as constituted, the court was bound by its o*

*ath to view all the inhabitants of New Mexico as citizens of the*

*United States and to execute the laws in regard to them as such,*

*leaving the responsibility of the question of its constitutionality*

*to fall back upon the power which constituted it.*

`#280 (p.272)`

*272*

*citizens, subject to her laws and liable to penalty for their infraction in like manner as
citizens of any other Territory of the United States. By the authority in him vested he*

established a civil government, a superior court, with jurisdiction as a United States d istrict court. In this last-

named court I, by appointment, act as United States district attorney, and have felt it my duty to prosecute all acts of treason committed by the inhabitants of this territory, holding them responsible for all their acts as citizens of the United States.

In nearly all the cases tried the counsel for the defense have entered pleas to the juris diction of the court, which the court overruled, and in the case of Trujillo, who was co nvicted, the defense plead the jurisdiction of the court before the jury, declar ing it to be unconstitutional to try any native inhabitant of New Mexico for the crime of treaso n against the Government of the United States until by actual treaty with Mexico he b ecame a citizen. The court ruled out any consideration of this point by the jury, leavin g it only the evidence and the facts upon which to make its verdict. Considering that a s constituted, the court was bound by its oath to view all the inhabitants of New Mexic o as citizens of the United States and to execute the laws in regard to them as such, le aving the responsibility of the question of its constitutionality to fall back upon the po wer which constituted it.

I am anxious to receive your counsel and advice at the earliest possible moment in re gard to all the matters above referred to.

Mails for this place will no doubt leave Fort Leavenworth regularly hereafter, and I tr ust you will oblige me by replying to this by the first opportunity.

Very respectfully, your obedient servant, FRANK P. BLAIR. Hon. John Y. MAsoN,Att orney-General of the United States.

The Attorney-
General referred the matter to the War Department. Hon. W. L. Marcy was then Secre tary of War, and he addressed his communications relating to the matter to Col. Sterli ng Price, in com mand of the United States forces in New Mexico. From these com mu nications the following passages are quoted:
WAR DEPARTMENT, June 11, 1847. SIR:+ + + + + + +

I am not aware that the President has yet received the petition for the pardon of Anton io Maria Trujillo, but I have conversed with him, and am now enabled to present his v iews on that subject.

The temporary civil government in New Mexico results from the conquest of the count ry. It does not derive its existence directly from the laws of Congress or the Constituti

*on of the United States, and the President can not, in any other character than that of Commander in Chief, exercise any control over it. It was first estab lished in New Me xico by the officer at the head of the military force sent to conquer that country under general instructions contained in the communication from this Department of the 3d o f June, 1846. Beyond such general instructions the Presi dent has declined to interfere with the management of the civil affairs of this terri tory. The powers and authority p ossessed by General Kearny when in New Mexico were devolved on you as the senior military officer on his departure from that coun try. They are ample in relation to all matters presented to the consideration of the President in the communication of the ac ting governor, Vigil, dated 23d March last, and to you as the senior military officer, o r to whosoever is such officer, he will leave such matters without positive or special di rection.*

*The foundation of the civil government in New Mexico is not der ived directly from the laws and Constitution of the United States , but rests upon the rights acquired by conquest. I call your parti cular attention to the fourth paragraph of my letter of the 11th of June as containing the principles on which the tempo rary go vernment at New Mexico does or should rest. The territory conq uered by our arms does not become by the mere act of conquest a permanent part of the United States, and the inhabitants of s uch territory are not, to the full extent of the term, citizens of the United States. It is beyond dispute that on the establishment of a temporary civil government in a conquered country the inhabi tants owe obedi ence to it and are bound by the laws which ma y be adopted. They may be tried and punished for offenses. Thos*

*e in New Mexico who in the late insurrection were guilty of mur der or instigated others to that crime were liable to be punished for these acts either by the civil or military authority; but it is no t the proper use of legal terms to say that their offense was treas on committed against the United States, for to the Government of the United States as the Government under our Constitu tion it would not be correct to say that they owed allegiance. It appe ars by the letter of Mr. Blair, to which I have referred, that those engaged in the insurrection have been proceeded against as trai tors against the United States. In this respect I think there was er ror, so far as relates to the designation of the offense. Their offe nse was against the temporary civil government of New Mexico and the laws provided for it, which that government had the rig ht, and, indeed, was bound to see executed.*

*On two former occasions I have addressed you in regard to Truji llo, who has been convicted of participating in the insurrection a nd the execution of his sentence sus pended, and made known t he decided wishes of the President that his punishment should b e remitted. -*

*Firmness may under some circumstances be required as an ele*

*ment of security to the citizens of the United States and other pe*

*rsons in countries conquered by our arms.*

*...*

*The proprietor and operator of the telegraph line performing the act complained of is the military government of Cuba. The agents and instrumentalities by which the messages are transmitted are subject to the orders of the superior authorities of that government; upon whom rest the responsi- bilities for the course pursued. It can not be conceded that the action or discretion of the superior authorities of the military government of Cuba in respect of the use of its property or the performance of a public service, is subject to the discretion and control of the courts of that island or elsewhere.*

*MEMORANDUM RESPECTING THE EXERCISE OF THE POWER TO PARDON UNDER THE MILITARY GOVERNMENT MAINTAINED IN NEW MEXICO, ALSO THE ORDERS OF THE MILITARY GOVERNMENT OF CUBA RELAT- ING TO THE EXERCISE OF THE POWER TO PARDON UNDER THAT GOVERNMENT;. [Submitted July 25, 1901.] The conquest of New Mexico by the military forces of the United States was accomplished by the campaign of 1846. In compliance with instructions given by the President, the officer in command, Gen- eral Kearny, organized a civil government for the occupied territory and filled the executive and judicial offices by appointment.*

*The title of the United States commences with the completion of the conquest and dates from the period when the territory was occupied by the United States military forces. The military government of Cuba has issued certain orders in respect of pardons by that government;. Copies of such of said orders as have come to my notice are transmitted herewith, being Headquarters Division of Cuba, series 1900, Nos. 22, 26, 30, 37, 38, 43, 46, 48, 69, 104, 105, 111, 137, 139, 143, 156, 175, 197, 206, 240, 395,462, 489, 498, 518, (And also of the series of 1901, Nos. 4, 5, 12, 16, 113.)*

*p. 244 Although the organization of these governments was a war measure intended to further weaken the rebellion, the attempt of the Executive to determine and adjust; the relations, existing and prospective, sus- tained by the territory and inhabitants of the rebellious districts to the Federal Government, caused the first decided antagonism between the President and Congress growing out of the conduct of the war.*

*P370*

*Congress insisted, and properly so, that the Executive had exceeded his powers and encroached upon the powers of the legislative branch in attempting to provide for the permanent civil government of the territory subject to military occupation and to adjust; or establish the permanent political relations of said territory to the United States. It is not so apparent that in resisting said encroachment Congress did not invade the province of the Executive and exercise powers properly belonging to the President as Commander in Chief of the Army and Navy when it assumed direction and control of the military governments and legislated therefor.*

*Halleck says:*

*There can be no doubt that when the war ceases the inhabitants of the ceded territory cease to be governed by the code of war. Although the government of military occupation may continue, the rules of its authority are essentially changed. It no longer administers the laws of war, but those of peace. The governed are no longer subject to the severity of the code military, but are remitted to their rights, privileges, and immunities under the code civil. (Halleck's Int. Law, 3d ed., vol. 2, chap. 34, par. 18, p. 487.)*

*Military government;—that is, the administration of the affairs of civil government; exercised by a belligerent in territory of an enemy occupied by him—is not considered in modern times as doing away with all laws and substituting therefor the will of a military commander. Such government; is considered as a new means or instrument for the execution of such laws, natural and enacted, international and domestic, as are necessary to preserve the peace and order of the community, protect rights, and promote the war to which it is an incident. Under any government;, if for any reason the usual and ordinary means of enforcing the laws and accomplishing the purposes*

*of gov- ernment are found inadequate to meet an existing emergency, resort may be had to martial rule in order to enforce the law and accomplish the purposes of government;.*

*Such laws as require for their complete execution the exercise of the will, grace, or discretion of the former sovereign would probably be held to be ineffective under the succeed;- ing power. \* \* \* Cuba, however, is now under the temporary dominion of the United States, which is exercising there, under the law of belligerent right, all the powers of municipal government.*

*P493*

*Under the Republic of the United States the Government exercises only such rights as the people confer upon it. When Porto Rico was ceded to the United States our Federal Government did not succeed; to the prerogatives over said island inherent in the Crown of Spain under the monarchy. Our Federal Government has never been authorized to receive or in any way secure said prerogatives by transfer from a monarch or other- wise, and much less is it authorized to exercise such prerogatives.*

*P 452 (text 444)*

*.If in the granting of a right or privilege the sovereign has retained an iota of authority which may affect its untrammeled exercise and enjoyment, the right is not of the nature of an absolute one, but wholly of an inchoate and imperfect quality. As to inchoate, imperfect, incomplete, and equitable rights, the succeeding; sovereign is the absolute dictator. They can not be exercised against his sovereignty, but only by his grace, and his affirmative exercise is necessary to the validity of the conces- sion.*

*That doctrine deals with the rights of the previous owner, and the rights of the previous owner of the public property in Cuba were disposed of by the treaty of peace. Aside from tile ques- tion of military necessity, the questions involved relate to the inchoate; rights of the nonexisting independent government of Cuba and the duties and obligations of the United States resulting from the relation of trustee and cestu° que trust.*

*In other words, did not his avowed determination to effect the permanent acquisi- tion of such territory, his preparation to make the conquest, and his ability to effect it, as proved by the result, give the conqueror some inchoate; or inceptive right to the territory subsequently conquered; or did they not at least suspend the right of the original owner to alienate it? In order to obtain a satisfactory solution of this question we will recur to fundamental principles.*

*If the title thus conveyed is by municipal law complete and perfect the land becomes private property and must be so regarded by the conqueror. If it be inchoate; and imperfect, but bona fide and equitable, it nevertheless constitutes "property" in the sense in which that term is used in inter- national law. .*

*The conveyance of such property as had been completely alienated prior to the cession is to be respected, but that uncompleted convey- ances were nullified by the transfer of title to the United States; that the rights of individuals, created by uncompleted proceedings, are inchoate;, and are dependent upon the acts of grace of the succeed- ing sovereign; that neither the Executive nor the Secretary of War is authorized to perform the necessary acts of grace until specially authorized so to do by Congress. .*

*The transfer of territory establishes its inhabitants in such a position toward the new sovereignty that they may elect to become, or not to become, its subjects. Their obligations to the former government are canceled, and they may, or may not, become the subjects of the new government;, according to their own choice.*
*If they remain in the territory after this transfer, they are deemed to have elected to become its subjects, and thus have consented to the transfer of their allegiance to the new sovereignty.*

*In the opinion above referred to, the honorable Attorney-*

*General holds that the public lands and other public property in*

*the Hawaiian Islands can not be disposed of except upon provisi
on therefor by Con gress, for the reason that the fee title to said
property is in the United*

*States, although burdened with a trust in favor of the people of t
he island, and the existence of the trust does not change the rul
e. It is a general rule of property that title attaches somewhere t
o some one. That is to say, title does not, like Mahomet's coffin,
hang in mid-*

*air. It is apparent that the title to public property in Cuba has no
t passed to the sovereignty inherent to the people of Cuba, for t
hat sovereignty is dormant and incapable of acquiring title. It w
ould seem to follow that the correct theory is that the fee title to
 the public property in Cuba passed to the United States, burden
ed with a trust in favor of the future permanent government of
Cuba. If the fee is in the United States, then, without regard to t
he burdens attached to the fee, the authority to dispose thereof i
s vested in Congress.The situation is the same as though the Uni
ted States held the title to land in some other foreign country or
territory belonging to another recognized sovereignty. In order t*

*o alienate said property, the action of Congress must be had.Gr anting that Congress has not authority to legislate for the civil g overnment of Cuba does not weaken the theory advanced. Ther e is a vast difference between owning property in a country and exercising the right to regulate the government of the civil affair s of the inhabi tants of the country.An illustration may serve to make clear the point I have in mind. When a permanent govern ment of civil affairs has been erected in Cuba, the transfer of the affairs now in the hands of the intervening government may be accomplished by the present officials, who will relinquish said a ffairs and place them in the hands of the officials of said new go vernment. But can the transfer of the title to the public property in the island now held by the United States be accomplished in t he same way : Will a deed from the military governor of the isla nd divest the United States of its title : It seems to me that in ord er to pass the title it will be necessary.either for Congress to mak e the trans fer by legislative act or authorize some officer of the executive branch to make the conveyance, or after the new gove rnment has been estab lished and recognized, to effect the desir*

*ed purpose by treaty with the new government.If a deed from th e military governor is not sufficient to complete the title of the c estº que frust, it certainly can not convey better title to a strange r. -*

*If the Secretary of War does not agree with the foregoing, and is of opinion that the existing government of civil affairs in Cuba may dispose of public property of this character in the island, th e next question is, Shall the military government in Cuba exercis e said authority :*

*The vital question is, May the commander of the military forces engaged in the military occupation of Cuba exercise the rights o f a belligerent under the conditions existing in the island? Is not this question to be answered by propounding another: Are the p urposes for which the military force was sent into Cuba accompl ished or aban doned, and if not, may not the military force conti nue to exercise the rights of a belligerent until said purpose is ac complished or abandoned? In investigating these questions, it is necessary to bear in mind that the President, in his relation ther*

*eto, is not to be considered as a civil magistrate of the United St ates discharging his duty within the terri tory of the United State s. He is to be considered as the Commander in Chief of the Arm y and Navy, personally present at the head of his troops in a for eign country.*

*By the expression "maintaining adhesion" I understand the Chie f Justice to mean continuing within the sovereignty.It will be see n that a military government takes the place of a sus pended or destroyed sovereignty and of necessity continues until a perman ent sovereignty is again established in the territory. r In Cuba a permanent sovereignty is not established, and therefore the mili tary government continues.That military government may legall y continue in bello cessante equally in flagrante bello was the su bstance of the holding in Lamar v. Brown, 92 U. S., 187, 193 et s eq. (See also Leitensdorfer v. Webb, 20 How..., 176; Dow v. Johns on, 100 U. S., 168; Texas v. White, 7 Wall.., 700; The Grapeshot, 9 Wall., 132; Burke v. Miltenburger, 19 Wall., 524; Lewis v. Cocks , 23 Wall., 469; Mechanics' Bank v. Union Bank, 22 Wall., 276; P*

*enny witt v. Eaton, 15 Wall., 382.)In discussing this phase of mili*

*tary government Pomeroy says: "Military government" is the aut*

*hority by which a commander governs a con quered district whe*

*n the local institutions have been overthrown and the local ruler*

*s displaced and before Congress has had an opportunity to act u*

*nder its power to dis pose of captures or to govern territories. Th*

*is authority, in fact, belongs to the President; and it assumes the*

*war to be still raging and the final status of the con quered pro*

*vince to be undetermined, so that the apparent exercise of civil f*

*unctions is really a measure of hostility. "Martial law" is somethi*

*ng very different. It acts, if at all, within the limits of the country*

*against civilians who have not openly enrolled themselves as bel*

*ligerents among the forces of an invading or a rebellious enemy.*

*(Pomeroy's Constitutional Law (Bennett's 3d ed.) par. 712, p. 59*

*5.)*

*By the terms of the treaty of peace the sovereignty of the United*

*States permanently attached to the territory of the island, and*

*when the war ended the military government erected in the isla*

*nd ceased to be a substitute for a sover eignty and became the r epresentative of the sovereignty of the United States, and charg ed with the protection rather than the direction of sovereignty.If the doctrine is correct that a military government is a substitute ad interim for sovereignty, and that the purposes of the one erec ted in Cuba are uncompleted, and to promote said purposes the Commander*

*in Chief may exercise the rights of a belligerent, it follows that s aid government may dispose of the public property within its jur isdiction and exercise other powers of sovereignty, when necessa ry for the pur poses to be accomplished. The questions involved i n such exercise are ordinarily to be resolved by the military com mander.In the instance of public property in Cuba, the doctrine of post/iminy is not involved. That doctrine deals with the rights of the previous owner, and the rights of the previous owner of th e public property in Cuba were disposed of by the treaty of peac e. Aside from tile ques tion of military necessity, the questions in volved relate to the inchoate rights of the nonexisting independe nt government of Cuba and the duties and obligations of the Un*

*ited States resulting from the relation of trustee and cestu° que t*

*rust.*

*While not meaning to concede that Congress, by legislative act,*

*has power to restrain or control the proper exercise of the power*

*s of the Commander in Chief of the Army and Navy of the Unite*

*d States, occupying under the law of belligerent right foreign ter*

*ritory—a question that may well be open to doubt—*

*yet the expressed will and desire of the Congress, conforming as*

*it does to the previously established policy and practice of the E*

*xecutive Departments, is entitled to the respect of the Executive*

*Departments, and ought to be followed, unless some high neces*

*sity requires otherwise. (Op. on App. of Cable Co. to land cable i*

*n Cuba, March 25, 1899. 22 Op. 410.)*

*When Spain relinquished her sovereignty in Cuba she parted wit*

*h all the royal prerogatives. The laws which theretofore had gov*

*erned the exercise of prerogative rights of the Crown of Spain di*

*d not pass to the successors in sovereignty, whether such success*

*ors be considered the United States of America as trustees for th*

*e pacification of the island or the people of Cuba in a congregat*

*ed sense. (See Mumford v. Wardwell, 6 Wallace, 435; Pollard's L*

*essee v. Hagan, 3 Howard, 225; Harcourt v. Gaillaird, 12 Wheato*

*n, 523. See also, 22 Opin ions, 514, 521, 546, 551.)*

*Both by the rules of public law that apply to foreign territory sei*

*zed and held as a conquest and by the terms of the resolution of*

*Congress the United States, upon taking possession of the islan*

*d, rightly entered upon the exercise of sovereignty, jurisdiction, a*

*nd control over said island. All the usual incidents of sovereignty*

*and jurisdiction pertain to the military occupation originally gai*

*ned by force of arms and now maintained in pursuance of the tr*

*eaty of peace. It is true that that sovereignty and jurisdiction are*

*exercised by the United States as a trustee for the benefit of the*

*people of Cuba, but the United States has a distinct and well-*

*defined duty and purpose in connection with Cuba, namely, to g*

*overn and control the island, to "exercise sovereignty, jurisdictio*

*n, and control over it" (to use the language of the resolution) for*

*its pacification. No limitation upon the ordinary power of a con*

*queror over conquered territory is created by this trust.*

*The United States is bound, in good conscience, to exercise its te*

*mporary sover eignty and control for the benefit of the Cuban p*

*eople; but as to what acts of sov ereignty it will perform, the par*

*ticular manner in which it will perform them, and the subjects u*

*pon which it will permit its sovereign force to operate, the Unite*

*d States, acting through the President as Commander in Chief, i*

*s the sole judge. The public property of Cuba, by the treaty of pe*

*ace, was not vested in the United States as a proprietor, but had*

*theretofore been partly in its possession as conqueror, and the r*

*emainder was by Spain delivered over to its possession as conqu*

*eror and as trustee for the future benefit of the Cuban people. C*

*uba, therefore, rightly continues to be governed under the law o*

*f belligerent right and not under the domestic laws of the United*

*States. According to the law of belligerent right, the will of the c*

*onqueror supplants the former political laws and powers which*

*prevailed in the conquered territory, and the conqueror may ma*

*ke such new laws, rules, and regula tions as he sees fit. (Brown v . U. S., 8 Cranch, 110.) Under this principle it is lawful for the co nqueror, in administering the conquered territory, to make such use of the property previously belonging to the former sovereign as he sees fit. There is, therefore, in the President of the United States, acting by virtue of his constitu tional authority as Comm ander in Chief of the Army and Navy, adequate power to use an d make disposition of property in Cuba formerly belonging to th e Crown of Spain, or subject to the imperial prerogative, and thi s includes the right to dispose of mining and other property for merly belonging to the Spanish Crown. Whether this power of th e President has been adequately conferred upon the military go v ernor or other American officers in Cuba I am unable to say, a s I am not furnished with the orders of your Department which have been heretofore issued, but, in my judgment, the President, as Commander in Chief, could authorize the military gov ernor of Cuba to make grants of mining rights, if the President desired to do so.*

*P94*

*These limits consisted, in part, of organized States, and, in part, of Territories, the absolute property and dependencies of the United States. These States, this Territory, and future; States to be admitted into the Union are the sole objects of the Constitution. There is no express provision whatever made in the Constitution for the acquisition or govern- ment of territories beyond those limits.*

*It only proves, sir, that we can admit a State into the Union which is a State de facto by revolution. When the debates of the convention were in progress, the section declaring that new States may be admitted was inserted with reference to a future; admission of the Canadas, then a dependent province, which of course could only become States by revolution.*

*The position taken by the United States in regard to the transfer of liability for indebtedness of the Spanish Government incurred in Cuba is, that questions relating thereto are to be referred to and determined by the future; permanent government of the island when that govern- ment assumes the exercise of independent sovereignty.*

*Such prizes and capture shall be condemned in the district or circuit court of the United States having jurisdiction of the amount, or in admiralty in any district in which the same (may) be seized, or into which they may be taken and proceedings first instituted. The original act provided: That if, during the present or any future; insurrection against the Government of of the United States, etc. (12 Stat. L., 319.) If the insurrection in the Philippines is held to be an "insurrection against the Government of the United States," it would appear that Congress has already declared the will of the sovereignty of this nation and declared for the confiscation of the private property of the insurgents, and that proceedings in regard thereto were to be con- ducted in admiralty.*

*The Spanish Gov. ernment manifestly desired that its subjects domiciled in the territory surrendered should possess and retain this right and that in its exer- cise Spanish subjects so domiciled should have absolute*

*equality with the native citizens. In the marts of trade in Cuba a Spanish subject is a foreigner and his rights are limited by existing or future; laws regulating the acts of grace by which a foreigner is permitted to engage in the commerce of the island. But in the courts a Spanish subject resident in Cuba has all the rights of a native citizen.*

*The course or policy pursued by Congress as to soil submerged by non-navigable waters in territory acquired from foreign nations, differs from that adopted as to soil submerged by navigable waters. For many years it was maintained that the United States held the land submerged by navigable waters in trust for the future; States which should be erected in the territory, and that Congress could not dis- pose of said land.*

*The discretion of the President in the exercise in hostile territory of the war powers of the United States for the enforcement of measures intended to suppress an armed insurrection against the authority of the United States, is not subject to the control of the judicial branch of this Government;. 7. The legislative branch of the Government of the United States may participate in the exercise of said war powers.*

*It will be seen that the question involved is not Are the Philippine Islands foreign terrritory ! but Are the Philippine Islands hostile terri- ritory ! The determination of this question belongs to the political branch of this Government; and is to be made by the Executive, in the absence of Congressional action. It is one of those powers in the exercise of which the Executive binds the courts, and with reference thereto the United States Supreme Court say: And in this view it is not material to inquire, nor is it the province of the court to determine, whether the Executive is right or wrong.*

*Said acts do nothing more than to declare the rule established by the laws and usages of war, and relate exclu- sively to insurrections in a State or several States of the Union. They clearly evidence that the legislative branch of this Government; recog- nizes the authority to regulate commercial intercourse with insurgent territory by exercise of belligerent rights. Argument is unnecessary to establish that a national authority, based upon the laws of nations, which the United States may exercise over inhabitants of a State of the Union, may also be exercised*

*over the inhabitants of any territory subject to its sovereignty.*

*In 1874, upon the recommendation of the Committee on "Alien Claims," Congress assumed the position that the right of petition guaranteed by the Constitution enabled a citizen of the United States presenting a claim against this Government; to Con- gress to demand the consideration of said claim as a right; that said privilege did not extend to aliens; and thereupon Congress declared that claims of aliens can not properly be examined by a committee of Congress, there being a Department of this Government; in which most questions of an international character may be considered—that which has charge of foreign affairs; that Congress can not safely and by piecemeal surrender the advantage which may result from diplo- matic arrangements; that this has been the general policy of the Government, and Congress has not generally entertained the claims of aliens and certainly should not unless on the request of the Secretary of State.*

*.SIR: In reply to your telegram stating that claims are presented by French citi- zens and other aliens through Congress to the Committee on War Claims, I have to remark that such presentation is entirely inconsistent with usage, which requires that aliens must address this Government; only through the diplomatic representa- tives of their own governments. This Department refuses to entertain applications or to receive claims from aliens except through a responsible presentation by the regularly accredited representa- tive of their government.*

*If the War Department shall not attempt to deal with alien claims, the final action of the Department on such claims now pending therein would be to return the papers to the claimant and advise him of such determination.*

*The officer in the United States Army who is now acting as governor of said island is an official of the United States and derives his authority from this Government; and not from the Crown of Spain. In Munford v. Wardwell (6 Wall., 423, 435) the United States Supreme Court say: Mexican rule came to an end in that department (California) on the 7th of July, 1846, when the government of the same passed into the control of our military authorities.*

*And see:*

*It is unnecessary to consider at this stage whether violation by Japan of the terms of the mandate **ipso facto** terminated the mandate because existence of the mandate does not present any legal obstacle to an American military administration of the islands during occupation.*

*The United States, as belligerent occupant of the territory, supersedes the Japanese Government as the actual and lawful government of the territory. There is no question of the lawfulness under international law of the American occupation.*

*Belligerent occupation is a temporary rather than a permanent status and does not transfer sovereignty to the occupant although during such occupation the belligerent occupant is entitled to exercise the rights of sovereignty subject to the rule of international law dealing with military occupation.*

*The fact of occupation does not operate to terminate the mandate although it may suspend its operation. The belligerent occupant is not subject to the terms of the mandate or responsible to the League of Nations. The military administration of the belligerent occupant is not bound by the mandate provision concerning the establishment of bases and fortifications and is not required to make reports to the Council of the League of Nations. Any rights of the League of Nations in the mandated territory are in abeyance during belligerent occupation and need not be of concern to the military administration.*

*The belligerent occupation does not confer United States nationality upon the inhabitants of the Japanese Mandated Islands. The mandate, however, did not confer Japanese nationality upon them. Native inhabitants, therefore, should not be treated as enemy aliens.*

*https://history.state.gov/historicaldocuments/frus1944v05/d1197*

*The treaty is silent as to the status of the native inhabitants of the territories relinquished and evacuated by Spain. The occupation of the island of Cuba as a relinquished territory is temporarily under the administration of the military authorities of the United States. While the native inhabitants of Cuba have effectively ceased to be the subjects of Spain, they have not acquired a distinct*

*status, either independent or dependent upon the United States as the custodian of the territory.*

*They are not citizens of the United States, nor can any scheme of provisional registration be adopted with a view to such a contingency. They may, however, during the interregnum, when temporarily sojourning in a foreign country, be protected through the exercise of good offices by the representatives of the United States in case of need upon due establishment of their nativity and of their merely temporary absence from Cuba and intention to return to and permanently reside in that island.*

*As to the status of the native inhabitants of Porto Pico and the islands adjacent thereto which have been ceded to the United States, the Congress has not yet legislated with regard to their civil and political rights, so that even as respects the native inhabitants residing in that island there is no present formality or procedure provided for the attestation of their citizenship; but in the interim every bona fide citizen of the ceded islands is entitled to the protection of the United States as against every foreign government.*

*The treaty is silent as to the status of natives of the ceded islands who are not actually inhabitants thereof—that is, dwellers within the ceded territory. It can not be presumed that native inhabitants of Porto Rico temporarily sojourning for a brief time in another country thereby abandon their status as such inhabitants, and it is proper that the civil and political rights which they may have by virtue of the treaty should be guarded, and that they should be represented by the diplomatic and consular agencies of the United States in matters involving relation with the power in whose territory they may be temporarily sojourning.*

*Under these circumstances the diplomatic and consular officers of the United States in foreign countries are authorized to register in their legations and consulates as such the names of native inhabitants of Cuba or Porto Rico who may be temporarily sojourning within their jurisdiction, and to exercise good offices for the protection of such native Cubans and Porto Ricans as may seek it for some well-established cause.*

*They will give official protection to native Porto Ricans so registered in all matters where a citizen of the United States similarly situated would be entitled thereto, being careful to have it appear that they are protected as native inhabitants of Porto Rico and not as citizens of the United States.*

*As to native inhabitants of Cuba so registered, the intervention of diplomatic and consular officers by way of good offices shall be exercised for their protection should they seek it for some well-established cause.*

[Page 895]

*In registering Cubans and Porto Ricans the diplomatic and consular officers of the United States should be careful to require full establishment by satisfactory evidence that the applicant is in fact a native inhabitant of Cuba or Porto Rico; that he has not lost that quality by naturalization in any other country or by assuming therein obligations inconsistent with his original allegiance; and, in the case of an inhabitant of Porto Rico, or the adjacent ceded islands, that it is his purpose in good faith either to return to his native territory to reside or to come to the United States, with a view in either case to availing himself of the privilege of citizenship which may be hereafter established by act of Congress. Care should be taken to distinguish between the applications of native Cubans and native Porto Ricans. As indicated above, the treaty makes no provision for the future status of the inhabitants of the Spanish territories as to which Spain has relinquished her sovereignty, so far as concerns their acquisition of any other citizenship. The sole proviso (article 9) is that in case "Spanish subjects, natives of the Peninsula," remain in the relinquished territory, "they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty, a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside." Obviously the diplomatic and consular representatives of the United States in foreign countries have no function whatever as respects the taking of such declaration of conservation of Spanish allegiance. All that they can do is to take provisional cognizance of any declaration of a native inhabitant of Cuba that it is his intention to return to Cuba and identify himself with that relinquished territory.*

*As to Porto Ricans, there is enjoined upon you the importance of clear and satisfactory evidence of the Porto Rican nativity of any applicant for registry and protection. Should an applicant be found to be merely a native of the peninsula residing until recently in Porto Rico, you should be careful to advise him that your instructions do not authorize you to register him in the legation or consulate as a **native inhabitant**, nor to accept from him any declarations of adoption of the nationality of the **ceded** territory in which he may have resided. Actual residence within the ceded territory at the time of the cession and during*

*one year thereafter are, under the treaty, required to establish the adoption of the nationality of such ceded territory.*

https://history.state.gov/historicaldocuments/frus1900/d1029

III. *Views of Other Governments*

*China*

"The following paragraph should be added to Article 18 (of the U.S. March draft) as its second paragraph:

'For the purpose of the present Treaty, the nationals of an Allied Power shall be deemed to include all the inhabitants of the territories renounced by Japan and administered by such Allied Power; and the vessels and companies of an Allied Power shall be deemed to include all those registered in accordance with the laws and regulations enforced by such Allied Power in such territories.'"

(*Comment*—While obviously directed toward assuring that Formosan claims are recognized as Chinese claims, the proposed paragraph would affect all ceded or renounced territories. Thus the arrangements contemplated in Article 5 of the May 3 draft regarding claims of the ceded territories and property and claims related to the trust territories would be pre-determined to be the same treatment as is provided for Allied claims and Japanese property in Allied territories. The leaving of these matters to future arrangements reflects the U.S. desire not to prejudge the issue pending further study. In the meantime, we should not accept a formula which, for example, would by the test of "administration" make the inhabitants of the Trust Territory nationals of the United States for purposes of the treaty.)

https://history.state.gov/historicaldocuments/frus1951v06p1/d585

*Swinnerton v. Columbian Insurance Co.*

*September Term, 1867*

*Thos. G. Sherman, for the appellants.*

*John H. Reynolds, for the respondents.*

*HUNT, J.*

*The body of the policy on which this action is brought contains the following clause: "Touching the adventures and perils which the said Columbian Insurance company is contented to bear and take upon itself in this voyage, they are of the seas, men-of-war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, reprisals, taking at seas, arrests, restraints and detainments of all kings, princes or people of what nation, condition or quality soever." In the margin of the policy is the following statement: "Warranted free from loss or expense arising from capture, seizure or detention, or the consequences of any attempt thereat." It is clear, upon authority, that the recital last quoted constitutes a warranty on the part of the  assured, and that it is a qualification of the obligation of the insurer contained in the covenant before cited. ( Dole v. Merchants' Ins. Co., 51 Maine, 465; Dole v. New Eng. Ins. Co., 6 Allen, 373; Fifild v. Ins. Co., 47 Penn. 166; The Prize Cases, 2 Black U.S. 635.)*

*It is held in the same cases that the capture of an insured vessel by a cruiser of the so-called Confederate States is within this warranty, and relieves the insurer from liability upon the policy. These decisions were based upon the principle, that, when a portion of the citizens of a civil government have rebelled, established another government, resorted to arms to maintain it, and the rebellion is of such magnitude that the military and naval forces of the government have been called out to suppress it, they are to be regarded as belligerents. To create belligerent rights, it is not necessary that there should be war between separate and independent powers. They may exist between the parties to a civil war. A state of actual war may exist without a formal declaration of it by either party, and this is true both of a civil and a foreign war. A civil war exists, whenever the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts cannot be kept open. (2 Black Prize Cases, 667, 668.)*

*It is further held, by the same authorities, that the capture of an insured vessel by an unorganized body of men, who are thieves, robbers and pirates simply, with no pretense of authority from an organized government, does not relieve the insurer from liability under the clauses in question. I shall examine the questions arising in this case upon this theory of the rights of the parties.*

*On the 21st of April, 1861, the plaintiff's vessel was undergoing repairs in the port of Norfolk, Virginia, where she had been driven by stress of weather. On the morning of that day a body of men, thirty or forty in number, took her from the place where she was being repaired, and towed her to a wharf in another part of the city. Here, aided by an equal number of men on the wharf, they broke open the cabins of the vessel, filled her with stones, and took her about a  mile down the river. She was towed off amid the cheers and shouts of those on shore, and sunk at the mouth of the channel. The person conducting these operations paid no attention to the remonstrances of the captain, but informed him that what he did was by authority of the State of Virginia. The captain could obtain no aid from the military and no relief from the courts. It was a scene of public excitement — as the witness terms it, of madness — the occasion of which will appear hereafter.*

*Properly to appreciate the condition and rights of the parties, it is necessary to look at the state of the country on the 21st of April, 1861, when the events we have detailed, occurred.*

*The written Constitution, under which the government of the "United States of America" was formed, was adopted in 1787. At the close of the war with Great Britain, in which its independence was accomplished, the Union was composed of thirteen States. In 1861, the Union consisted of thirty-six States, possessing many rights independent of each other, and independent of the united government formed by them. Of these States Virginia was one, South Carolina, Georgia, Mississippi, Alabama, Texas and Florida were others. The disputes and jealousies existing between the different sections of the country and the people of the different States, took form and shape in the autumn of the year 1860. The elections held in November of that year resulted in the choice of Abraham Lincoln as President of the United States. A portion of the Southern States, professing to consider this result and the principles of the successful party as destructive to the institution of African slavery, then existing in those States, determined to withdraw from the Union. The right thus to withdraw had been claimed by those States for many years, while the claim had been steadily and uniformly denied by the Northern States.*

*On the 20th of December, 1860, with ostentatious defiance, the State of South Carolina, by a convention called to act upon this particular subject, declared that the ordinance of 1788, whereby the Constitution of the United States was  ratified, and all acts of the State of South Carolina ratifying*

*amendments of that Constitution, were repealed; and declaring that the "union now subsisting between South Carolina and other States, under the name of 'The United States of America,' is hereby dissolved." The raising of armies and the appointment of commissioners to proceed to Washington, to demand the delivery to that State of all forts, light-houses and magazines within its limits, and also for the apportionment of the public debt, and a division of all the public property of the United States, immediately followed. During the months of January and February then next, the States of Mississippi, Alabama, Louisiana, Florida and Texas, adopted ordinances to the same effect.*

*In the month of February, 1861, the deputies from these States assembled at Montgomery, in the State of Alabama, and organized a government upon the same general plan as the one then and now constituting the Union of the States of America. They elected a president and vice-president; organized a congress, to consist of senators and members from the several States forming their nation; a cabinet of executive officers was selected; the moneys and credits of the government were issued; commissioners for foreign States were appointed; military, naval and civil officers were designated; a national emblem was assumed; and all the forms of a permanent and an efficient government were adopted, with the name of "The Confederate States of America." The States of North Carolina, Virginia, Tennessee, Missouri and Arkansas subsequently joined this confederacy. It is sufficient, for the purpose of deciding the legal questions before us, to say, that the rebellion thus organized, assumed gigantic dimensions. A war was carried on for four years, by land and by sea, between the two governments, with varied success on the part of the different armies. It terminated in the triumph of the government and the complete overthrow of the rebellion, in the spring of 1865; but not until the government had expended three thousand millions of dollars in its suppression, and three hundred thousand  Northern soldiers had laid down their lives in thus maintaining the integrity of their government.*

*These subsequent and important transactions to which I have alluded so briefly, are competent to be considered in determining the status in the month of April, 1861, of the parties whose acts we are to consider. (Prize Cases, supra.)*

*When the State of South Carolina attempted its separation from the Union, its harbor contained several forts, garrisoned by United States troops. Both the*

*soil and jurisdiction of these forts belonged to the United States, and that government declined to yield them to the repeated and urgent demands of South Carolina. Major Robert Anderson, of the United States army, was in command of these forts in this month of April, and had transferred his men and munitions from Fort Moultrie to Fort Sumter, both being forts within a short distance of the city of Charleston and in its harbor. General Beauregard, who had been appointed, by the Confederate States, a brigadier-general in their service, was in command of the troops in the city of Charleston. The refusal to surrender Fort Sumter being persisted in, that officer, on the 12th day of April, by the special order of the secretary of war of the Confederate States, opened fire upon the fort. The preparations for its reduction had long been in progress, seventy men only formed its garrison, and seven thousand men formed the attacking force. An unarmed vessel, loaded with provisions for the relief of the garrison, had been fired upon by the Confederate authorities and compelled to abandon her purpose. After a seige of twenty-four hours, its men exhausted, its supplies consumed, and its quarters on fire, the fort was surrendered. Its commander, with his forces, marched out with the honors of war, saluting the flag of his country as it was lowered.*

*The news of this surrender was telegraphed to the authorities at Montgomery. In answer to the congratulations of the assembled multitude, L. Pope Walker, secretary of war of the Confederate States, announced the intention of his government to pursue its success, and predicted that, before the 1st of May following, the Confederate flag would float in triumph from the Washington capitol.*

*On the 15th day of April, President Lincoln issued a proclamation, reciting that the execution of the laws of the United States was obstructed in the States of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana and Texas, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by law, and calling forth the militia of the several States to the number of 75,000. Within ten days thereafter the president of the Confederate States issued a proclamation that he would grant letters of marque against the commerce of the United States, and did issue many commissions of that character. This call of President Lincoln was contemptuously refused by the Southern States, but earnestly and immediately responded to by the Northern States. The men needed were at once supplied. The sixth regiment of Massachusetts volunteers, while passing through the city of Baltimore, on the 19th of April, in*

*response to the President's call, was attacked by a mob. The most of the soldiers were raw recruits, unarmed, and separated from their officers. Three of the soldiers were killed, many were severely injured, and many of the mob were killed and injured. The railroads, leading to and from the city of Baltimore, were torn up and blockaded; troops and supplies could only reach Washington by a circuitous route, and that city was, for a time, in a state of substantial blockade. The excitement created by these transactions was scarcely inferior to that caused by the attack upon Sumter. It pervaded all classes, and all sections, receiving approval or condemnation according to the position of the parties affected.*

*Before referring to the condition of public affairs in Virginia, at the time of the capture of the vessel in question, the following extract from the Southern historian of the war, will illustrate the condition of the country at the close of Mr. Buchanan's administration: "When he ceased to be President, on the 4th of March, 1861, seven Southern States went out of the Union; they had erected a new government;  they had secured every federal fort within their limits, with two exceptions, Sumter and Pickens; they had gathered, not only munitions of war, but had obtained great additions in moral power; and although they still deplored a war between the two sections as a 'policy detrimental to the civilized world,' they had openly and rapidly prepared for it. Fort Moultrie and Castle Pinckney had been occupied by the South Carolina troops; Fort Pulaski, the defense of Savannah, had been taken; the arsenal at Mount Vernon, Alabama, with twenty thousand stand of arms had been seized by the Alabama troops; Fort Morgan, in Mobile bay, had been taken; Forts Jackson, St. Philip, and Pike, near New Orleans, had been captured by the Louisiana troops; the Pensacola navy yard and Forts Barrancas and McRae had been taken, and the seige of Port Pickens commenced; the Baton Rouge arsenal had been surrendered to the Louisiana troops; the New Orleans mint and custom-house had been taken; the Little Rock arsenal had been seized by the Arkansas troops; and on the 18th of February, General Twiggs had transferred the military posts and public property in Texas to the State authorities." ("The Lost Cause," by Edward A. Pollard, Trent Co. publishers, N.Y., 1866, pp. 98, 99.)*

*Virginia was ultimately a member of the Southern Confederacy, and in the desolation of her territory by contending armies, illustrated the horors of civil war. At this time she was in active sympathy with the Confederates, and at once refused to comply with President Lincoln's call for men to sustain the*

*country. On the 17th of April the Convention of the State of Virginia passed its ordinance of secession. That portion of it which required its submission to the popular vote was entirely disregarded. The State put itself in active and immediate co-operation with the Southern Confederacy. On the same day another ordinance was passed, "to call volunteers into the service of the State." (Laws of Va. 1861, app. 8.) The governor issued a proclamation under this ordinance, calling upon the militia to hold themselves in immediate readiness, and in reference to President Lincoln's call for men he uses this language: "That Virginia, by a majority approaching to entire unanimity, declared at its last session, that the State would consider such an exertion of force as a virtual declaration of war, to be resisted by all the force at the command of Virginia; and subsequently the State convention, now in session, re-affirmed the same policy with almost equal unanimity." In refusing to respond to this call, Governor Letcher closes his communication in these words: "You have chosen to inaugurate civil war, and we will meet it in a spirit as determined as the administration has exhibited toward the South." (An. Reg. 1861, "Virginia.")*

*On the day of the passage of the ordinance of secession, the printed sign "United States Court," in the custom-house building, was taken down, and the Confederate flag was raised on the capitol, in which the convention was sitting. The custom-house was taken out of the hands of the United States officials and placed under a guard of State troops. The steamships Yorktown and Jamestown (private property) were seized and put in charge of Virginia State troops. (Id.)*

*On the night of the 16th of April, says the historian Greeley (Am. Con. vol. 1, p. 471), "the channel of the Elizabeth river near Norfolk, was obstructed by sinking two small vessels therein, with intent to preclude the passage either way of federal ships of war. The number appears to have been increased during the following nights, while a hastily collected force under Gen. Taliaferro, a Virginia brigadier, who reached Norfolk from Richmond on the eighteenth, was reported to be preparing to seize the navy yard and federal vessels, during the night of Saturday the twentieth." At this yard were the valuable steam frigate Merrimac, the Cumberland, the Germantown, Plymouth, Raritan, Columbia, Dolphin, Pennsylvania, Delaware and Columbus, with nearly two thousand cannon, and immense quantities of arms, munitions of war, naval stores and timber. (Id. 473.) On the twenty-first of April, all these vessels were sunk or burned, and all this property destroyed*

by the United States authority, under the direction of Captain Paulding of the navy, to  prevent its falling into the hands of the rebels. Cannon were spiked, the muskets and revolvers broken, shot and shell thrown into the water, the ships scuttled or fired, and the barracks set on fire. As soon as the United States troops had departed, a volunteer company took formal possession in the name of the State of Virginia and raised her flag on the ruins. (Id. 476.)

In describing the effect upon Virginia, of President Lincoln's proclamation of April fifteenth, calling for seventy-five thousand men, Mr. Pollard says: "Two days after the interview of her commissioners with President Lincoln, her people were reading his call for a land force of seventy-five thousand men; and almost instantly thereafter, the proud and thrilling news was flashed over the South, that Virginia had redeemed the pledges she had given against coercion, and was no longer a member of the federal Union, but in a new, heart to heart, defiant union, with the Confederate States of the South." ("Lost Cause," p. 116.)

The same authority says, that, "on the 29th of April, President Davis (of the Confederate States) wrote to the Confederate congress, then convoked by him: 'There are now in the field at Charleston, Pensacola, Forts Morgan, Jackson, St. Philip and Pulaski, nineteen thousand men, and sixteen thousand men are now en route for Virginia. It is proposed to organize and hold in readiness for instant action, in view of the present exigencies of the country, an army of one hundred thousand men.'" (Id. 117.) In another place he says: "Virginia had taken her decisive step, and passed her ordinance of secession on the 17th day of April. It became an immediate concern to secure for the State all the arms, munitions, ships, war stores and military posts within her borders which there was power to seize. Two points were of special importance, the navy yard at Gosport (opposite to Norfolk), with its magnificent dry-dock, its huge ship houses, shops, forges, ware rooms, rope-walks, seasoned timber for ships, masts, cordage, boats, ammunition, small-arms and cannon. Besides all these treasures, it had lying in its waters several vessels of war. The other point was Harper's  Ferry, on the Potomac river, with its armory and arsenal, containing about ten thousand muskets and five thousand rifles, with machinery for the purpose of manufacturing arms, capable of turning out twenty-five thousand muskets a year." (Id. 122.) A large force of Virginia volunteers, to the number of 2,500, was immediately collected to attack Harper's Ferry. To prevent its falling into their hands, the garrison set fire to the arms and buildings, and escaped across the railroad

*bridge into Maryland. The historian above quoted says: "The retreating garrison had laid trains to blow up the work-shops, but the courage and rapid movements of the Virginians extinguished them, and thus saved to their State the invaluable machinery for making muskets and rifles." This was on the eighteenth day of the same month of April.*

*It is impossible to shut our eyes so closely as not to see that a war had actually been commenced against the United States government, before the 21st of April, 1861. The evidences I have cited are unanswerable. The formal passage of the ordinance of secession by Virginia, the immediate appointment of commissioners to the Confederate government, the sinking of vessels in the channel, the presence of armed troops, the destruction of the navy yards, the assault on Harper's Ferry, the avowed declarations of the authorities of the State that she was to range herself with her southern allies, the concentration of military forces at Norfolk, the declaration by the officer in charge that this vessel was seized by authority of the State of Virginia, her sinking to obstruct the passage of United States vessels to this port, the shouts and applause of the people, the excitement pervading all classes, the impossibility of finding aid in the courts, afford the strongest reason to conclude that this seizure was an act of war, and not the act of a mob. The actors were not hostes humani generis, nor did they act causa lucri. The act of April 21st, 1861, is to be received and passed upon as we now, in 1867, see and understand it. It doubtless had greater significance than many of its actors were aware of, and was a prelude to a contest anticipated by none. (Prize Cases, Sup. 2 Black.) No declaration of war is necessary to give  to individuals or to nations the rights resulting from that condition of society. It is the actual condition that produces the result, and not the presence or absence of a declaration to that effect by either party. In the contest between the United States and Mexico, in 1846, the battles of Palo Alto and Resaca de la Palma, had been fought before the passage of the act of congress of May 13, 1846, which recognized "a state of war as existing by the act of the republic of Mexico." This act not only provided for the future prosecution of the war, but was itself a vindication and ratification of the act of the President in accepting the challenge, without a previous formal declaration of war by congress. (Prize Cases, 2 Black. 668.)*

*With the light reflected upon them by subsequent events, it would be absurd to say, that the taking of Fort Pulaski, which was the sea-coast defense of Georgia, or the seizure of Forts Jackson and St. Philip, which defended the*

*approach to New Orleans, or the attack upon Harper's Ferry, a depot and manufactory of fire-arms, were the acts of riotous individuals simply; or to say that the surrender of Gen. Twiggs, by which an empire in extent, an army in numbers, and a fortune in property, were transferred to the rebellion, was the illegal act of an individual simply; or to say that their acceptance by the State of Texas was a private and unauthorized transaction only. Each of these acts was in pursuance of a purpose well understood. They were intended, as they were calculated, to weaken the military power of the government, and strengthen that of the States named — to furnish the means of rebellion, and to destroy the power to suppress it.*

*Whether the act of seizing and destroying the plaintiff's vessel was a part of the same scheme, was a question for the jury. I think proof of the ordinance of secession was competent, and that the general question of the object and character of the seizure should have been submitted to them.*

*I have not overlooked the objection made by the respondent, to the consideration by this court, of the facts of history to which I have referred. It is objected that the case contains  no evidence of the existence of a civil war; that it does not show that the mob was acting by any public authority, and that no historical proof was offered to the court by any authentic history, that the condition of things existed, as we are all aware it did exist, in fact. This objection I do not consider a sound one. The rule I take to be this: That matters of public history, affecting the whole people, are judicially taken notice of by the courts; that no evidence need be produced to establish them; that the court, in ascertaining them, resort to such documents of reference as may be at hand and as may be worthy of confidence. Thus, in the prize cases already cited (2 Black. 667), the court use this language: "The actual existence of civil war is a fact in our domestic history which the court is bound to notice and to know." Knowledge of the main fact would necessarily carry with it knowledge of the particular acts of war which created that condition of things. Upon a careful reading of these cases, as reported, as well as of the arguments of counsel on both sides, and of the opinion of the court and the dissenting opinion of Judge NELSON, I see no statement that proof was made of any of the general facts of the early history of the rebellion. Particular proclamations were read, correspondence with foreign authorities was referred to, the special facts of the capture of the vessels and their circumstances were proved, and the general facts connected with the history of the country seem to have been assumed as within the judicial cognizance*

*of the court. I have quoted the language of the court on this point, and it was not denied by counsel against whom it applied, nor doubted in a dissenting opinion which holds that, until the passage of the act of congress of July 13, 1861, but three days before the battle of the first Bull Run, no war existed in a legal sense, between the armed hosts of the different sections of the country, but that it was simply "a personal war against the rebels" on the part of the President. The general language of the court is therefore entitled to full significance.*

*Mr. Greenleaf says, in his work on evidence (§§ 4, 5, 6): "All civilized nations, being alike members of the great  families of sovereignties, may well be supposed to recognize each other's existence and general public and external relations. The usual and appropriate symbols of nationality and sovereignty are the national flag and seal. Every sovereign, therefore, recognizes, and, of course, the public tribunals and functionaries of every nation take notice of, the existence and titles of all the other sovereign powers in the civilized world, their respective flags, and their seals of state. In like manner, the law of nations, and the general usages and customs of merchants, as well as the general laws of their own country, are recognized, without proof, by the courts of all civilized nations. * * * Neither is it necessary to prove things which must have happened according to the ordinary course of nature, nor to prove the course of time, or of the heavenly bodies, nor the ordinary public fasts and festivals, nor the coincidence of days of the week with the days of the month, nor the meaning of words in the vernacular language, nor the legal weights and measures, nor any matters of public history affecting the whole people. Courts also take notice of the territorial extent of the jurisdiction and sovereignty exercised de facto by their own government, and of the local divisions of their country, into States, provinces, counties, cities, towns, local parishes, or the like. * * * They will, also, judicially recognize the political constitution, or frame of their own government, its essential political agents or public officers, sharing in its regular administration, and its essential and regular political operations and action. Thus, notice is taken by all tribunals of the accession of the chief executive of the State or nation, under whose authority they act, the genuineness of his signature, the heads of department and the principal officers of State, the election or resignation of a senator of the United States, the appointment of a cabinet minister or foreign minister, marshals and sheriffs. * **

*"In fine, courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction. In all these and the like cases, where the memory of the judge is at fault, he resorts to such documents  of reference as may be at hand, and he may deem worthy of confidence."*

*In the Bank of Augusta v. Earle (13 Peters, 590), Chief Justice TANEY says: "And it is a matter of history which this court is bound to notice, that corporations created in this country have been in the habit for many years past, of making contracts in England of various kinds and to large amounts, and we have never seen a doubt suggested of the validity of these contracts."*

*In Jack v. Martin (12 Wend. 328), the court expressed the opinion that it was warranted in taking official notice of the existence of slavery in Louisiana, as a part of the public history of the country. For other instances of what is officially noticed by the courts, I refer to 3 Com. 188; 17 Wend. 88; 4 Seld. 182; 10 Barb. 406; 20 N.Y. 65; 6 Duer, 633; 3 Sand. Ch. 571; 6 Hill, 475; 7 Cow. 429; 7 Wend. 460; 16 N.Y. 125; 4 Kern, 623.*

*I entertain no doubt that the historical facts necessary to the decision of the case, were proper for the judicial consideration of the court, without the production or offer of proof.*

*I have cited the histories of Mr. Greeley and Mr. Pollard, not as authorities, nor because any authorities were needed, but as containing condensed and satisfactory statements of the particular facts, which were useful for the purposes of this action, and for the reason that the two historians, differing toto cœlo in their views and feelings, give concurrent statements of the facts in question. I should not deem it necessary that any history should be cited, or any proof made, to show that Henry the Fifth conquered France, or that his son lost it; that Charles First was beheaded, that Napoleon the First established an empire and died in exile. These are facts of general history, upon the truth of which courts would hold and jurors would find, assuming their existence. It is none the less a fact in general history, that Mr. Lincoln was the President of the United States, and that he was assassinated while holding that office. It is none the less true, and none the less historic, that a war between the different sections of the United States occurred  as I have recited, and that its origin in Virginia was based upon the facts I have stated. This rule is limited to no particular lapse of time, and to no particular class of*

*facts, except that they shall be those of general history. A new trial should be ordered.*

*All the judges concurring, except DAVIES, Ch. J., and WRIGHT, J., who were for affirmance,*

*Judgment reversed, and a new trial ordered.*

Respectfully submitted for the native and indigenous Formosans, as Next Friend, and Relator,

/s/ 28 USC 1746(2)

Attested under penalty of perjury within the US, its territories and possessions, on FORMOSA island

/s/ //s//   X    invoking 25 USC 2904 citizen Potawatomi illiterate in native tongue

Signed:

_____

Dr. Paul Maas Risenhoover, JD, DRC, Esq., Attorney at Law in the Kingdom of Hawaii Palmyra Atoll and Guantananmo Perpetual Lease Areas, under the USA, a Potawatomi Indian Executive Director, Robin Hood International Human Rights Legal Defense Fund of the Yeshiva Bnai Noah of the Bnai Noah Religious Society, and Spiritual Adviser, Allied American Formosa Trust Territory in formation Tainan, Taiwan, FORMOSA, West Pacific

AmericanSTEAMTargetOfficeR@gmail.com,
FormosaCivilGovernment@gmail.com,
NationalSTEAMTargetOfficer@gmail.com,
drpaulmaas@gmail.com,
ilovelibby@gmail.com,

Project14thAmendment@gmail.com

22 USC 619, 22 USC 611(m), 22 CFR 51.1, 22 CFR 120.13, 18 USC 3185, Neely v Henkel, Pearcy v Stranahan (no such relinquishment Treaty exists for US unless the FCN be so deemed in favor of Japan, see implying JCS 1651 is ended and SCAPIN 677 ceased preventing Japan from administering Formosa https://history.state.gov/historicaldocuments/frus1950v06/d774   ( c) What is the United States interpretation of Article 9 of the Japanese Constitution (Renunciation of War)? The United States respects this provision as an expression of the popular will in Japan embodied in Japan's fundamental law. Interpretation of the provision as it bears on Japan's right to defend itself from unprovoked attack, and to prepare for defense against attack, is a matter of Japanese concern under procedures set forth in the Constitution. Should the requisite majorities of the Diet and the people desire to amend the provision that too would lie within their power. (d) What is the United States view regarding Japan's continuing adherence to policy decisions adopted by the Far Eastern Commission, and to directives and orders issued by the Supreme Commander for the Allied Powers? It is considered that the peace treaty will be the sole expression of Allied views binding on Japan after the treaty comes into effect. While it is to be hoped that Japan will continue to observe FEC decisions and SCAP directives of lasting value even though those decisions and directives are not specifically confirmed in the treaty, this would be a matter for the Japanese to decide.)


28 USC 1746(2) affirmed under penalty of perjury (dischargeable)

Certificate of service by email on the Court and all available the parties:

Fredwithfish@gmail.com46, cwheileg@gmail.com, jporter2327@yahoo.com, jacobiam543@gmail.com, keno.steve@yahoo.com, Cjasbedwell@yahoo.com, PleaseHelp@SaveAaliyah.com, rdriskell@unseen.is, 58michaeld@gmail.com, estherwilliams@comcast.net, Janis80138@msn.com, jbm41161@yahoo.com, xxjohnnyg@yahoo.com, skyleramelia@yahoo.com, PlexusByE@yahoo.com, gregaj7@gmail.com, virginianye27@gmail.com, SaveMaryAndGrace@gmail.com, exchange4madi@gmail.com, marrysehrt@gmail.com, Sueawhitney@gmail.com, Jessjacobs23@gmail.com, Silvatra@Gmail.com, xxairmen@yahoo.com, FrankaSchneider@gmail.com,

intlekoferb@yahoo.com.I, enlaw14@msn.com, kobi44@hotmail.com, Davidgraham853@gmail.com, 55tdavis55@gmail.com, Fredwithfish@gmail.com, coloradoclgj2014forever@gmail.com, jinaykeller@yahoo.com, alabama-coordinator@mail.americanstatenationals.us, alaska-coordinator@mail.americanstatenationals.us, arizona-coordinator@mail.americanstatenationals.us, arkansas-coordinator@mail.americanstatenationals.us, WayneWCalifornia@protonmail.com, colorado-coordinator@mail.americanstatenationals.us, connecticut-coordinator@mail.americanstatenationals.us, delaware-coordinator@mail.americanstatenationals.us, florida-coordinator@mail.americanstatenationals.us, georgia-coordinator@mail.americanstatenationals.us, hawaii-coordinator@mail.americanstatenationals.us, idaho-coordinator@mail.americanstatenationals.us, illinois-coordinator@mail.americanstatenationals.us, indiana-coordinator@mail.americanstatenationals.us, iowa-coordinator@mail.americanstatenationals.us, australianstatesassembly@use.startmail.com, asa@use.startmail.com, htc.shyne@gmail.com, mortenc28@protonmail.com, info@crowd4good.me, fabio.florian@gmail.com, travassosvaldez@gmail.com, mplucian@zohomail.com, kansas-coordinator@mail.americanstatenationals.us, kentucky-coordinator@mail.americanstatenationals.us, louisiana-coordinator@mail.americanstatenationals.us, maine-coordinator@mail.americanstatenationals.us, massachusetts-coordinator@mail.americanstatenationals.us, maryland-coordinator@mail.americanstatenationals.us, michigan-coordinator@mail.americanstatenationals.us, minnesota-coordinator@mail.americanstatenationals.us, regional@mail.americanstatenationals.us, missouri-coordinator@mail.americanstatenationals.us, montana-coordinator@mail.americanstatenationals.us, nebraska-coordinator@mail.americanstatenationals.us, nevada-coordinator@mail.americanstatenationals.us, newhampshire-coordinator@mail.americanstatenationals.us, newjersey-coordinator@mail.americanstatenationals.us, newmexico-

coordinator@mail.americanstatenationals.us, northcarolina-coordinator@mail.americanstatenationals.us, northdakota-coordinator@mail.americanstatenationals.us, ohio-coordinator@mail.americanstatenationals.us, oklahoma-coordinator@mail.americanstatenationals.us, oregon-coordinator@mail.americanstatenationals.us, pennsylvania-coordinator@mail.americanstatenationals.us, rhodeisland-coordinator@mail.americanstatenationals.us, southcarolina-coordinator@mail.americanstatenationals.us, southdakota-coordinator@mail.americanstatenationals.us, tennessee-coordinator@mail.americanstatenationals.us, texas-coordinator@mail.americanstatenationals.us, utah-coordinator@mail.americanstatenationals.us, vermont-coordinator@mail.americanstatenationals.us, virginia-coordinator@mail.americanstatenationals.us, washington-coordinator@mail.americanstatenationals.us, westvirginia-coordinator@mail.americanstatenationals.us, wisconsin-coordinator@mail.americanstatenationals.us, wyoming-coordinator@mail.americanstatenationals.us, davecoffelt@comcast.net, newyork-coordinator@mail.americanstatenationals.us